JUSTICE SANDEFUR
delivered the Opinion of the Court.
¶1 Steven Todd Hoover (Hoover) appeals the order of the Montana Eleventh Judicial District Court, Flathead County, affirming the Flathead County Justice Court’s denial of his motion to suppress evidence obtained subsequent to an investigative law enforcement stop. We reverse.
Did the Justice Court erroneously deny Hoover’s motion to suppress evidence?
BACKGROUND
¶2 Sometime before midnight on August 2, 2013, Defendant Hoover, accompanied by an adult female acquaintance, drove his Ford pickup truck into a private mini-storage complex (AAA Mini-Storage) located just off Highway 2 East on the outskirts of Kalispell, Montana. The partially fenced complex had no gate and was open to the public 24 hours a day, seven days a week. The couple parked with their lights off in a dark and relatively secluded spot at the back end of the complex between two rows of storage units to engage in consensual intimacy on a warm summer night.
¶3 Just before midnight, while patrolling through an adjacent automobile dealership lot, Sgt. Phil Meredith, a Flathead County deputy sheriff with over 21 years of experience, 18 on patrol, noticed Hoover’s vehicle parked in the dark between two storage unit rows on the publicly accessible lot. After stopping and turning off his lights to observe further, Meredith saw the silhouettes of two people sitting in the front seats of the parked truck. He later testified that he could not see what they were doing, but saw enough movement to tell that two people were in the truck.
¶4 Based on his experience that people do not commonly access storage units at midnight and his general awareness that storage units “are always being broken into,” Sgt. Meredith immediately suspected that a storage unit break-in might be in progress and summoned other law enforcement officers in the area to assist him in contacting the occupants of the vehicle to investigate further. Upon the arrival of two more Flathead County sheriffs deputies and a Montana Highway Patrol (MHP) trooper, Meredith and the other officers gathered on foot at the entrance of the complex where they split into two groups and set out to sneak-up behind the truck and converge on the occupants from both sides.
¶5 Sgt. Meredith and the trooper crept up to a point about 10 to 15 *535 yards behind the pickup where they could look around a storage unit and see the vehicle. Upon observing from that vantage point for “less than a minute,” Meredith saw that the passenger side window was down and again saw the silhouettes of two people sitting in the pickup—one in the driver’s seat and the other in the front passenger seat. He testified that he still could not see what the occupants were doing but the driver appeared to be looking down at the steering wheel or into his lap. Based on his experience that people often find a secluded spot to use illegal drugs, Meredith testified that, in addition to his initial suspicion of a possible break-in, he suspected that the driver might also be engaged in illegal drug activity, such as “either loading up a marijuana bowl or shooting up.” However, Meredith articulated no specific observation, fact, or circumstance particularly indicative of such illegal drug use.
¶6 Without any additional information, the four officers left the cover of the storage units and walked up on the parked truck from the rear. Sgt. Meredith and the MHP trooper walked up along the passenger side and the other two deputies walked up along the driver’s side. As they approached from behind on both sides of the truck, the officers heard nothing from inside the cab and saw only that the driver was still looking down towards his lap with the passenger “just sitting there.”
¶7 When Sgt. Meredith and the trooper reached the open passenger side window, Meredith lit up the interior of the cab with his flashlight and announced the presence of law enforcement officers. Looking into the illuminated interior of the cab, Meredith saw Hoover sitting in the driver’s seat with his penis exposed, masturbating while his fully clothed female companion was calmly watching from the front passenger seat. The officers saw no indication of a possible break-in, illegal drug use, or other illegal activity. The officers further observed no indication that Hoover’s female companion was in distress, not free to leave, or in any way threatened or concerned about Hoover’s conduct. Meredith later testified that the two people “were never close together.”
¶8 Nonetheless, upon seeing what was going on, Sgt. Meredith became further concerned that Hoover might be engaged in indecent exposure or about to subject the woman to sexual intercourse without consent. He testified that he thought further intrusion and investigation was necessary to determine whether “the female was comfortable being there with a man exposing his penis.” After first questioning Hoover’s companion and confirming that she was there of her own free will, the officers began questioning Hoover. Despite what *536 he had clearly observed and confirmed, Meredith testified that he still thought further investigation was necessary to dispel his initial suspicion of a possible storage unit break-in. He articulated no specific factual basis for this continued suspicion.
¶9 While questioning Hoover, one or more of the officers noticed an alcoholic odor on his breath and requested a preliminary breath test (PBT).[1] Hoover consented and the PBT indicated a 0.05% blood alcohol concentration. Upon further inquiry, the officers ascertained that Hoover was on probation supervised by the Montana Department of Corrections. At the direction of an on-call probation officer, the officers arrested Hoover on suspicion of violating the alcohol restriction of his probation. Upon searching him incident to arrest, one of the officers found a small marijuana pipe with suspected residue in Hoover’s pants pocket. The officers then transported him to jail and cited him into Flathead County Justice Court on the charge of Criminal Possession of Drug Paraphernalia, a misdemeanor in violation of § 45-10-103, MCA.
¶10 In Justice Court, Hoover filed a motion to suppress all evidence gathered incident to the “investigative stop” on the asserted ground that the officers lacked sufficient particularized suspicion to detain and question him about potential criminal activity. Following a hearing, the Justice Court denied the motion on the ground that no constitutional seizure of Hoover’s person occurred, thus eliminating any legal requirement for particularized suspicion to conduct further investigation. Hoover then pled “no contest” to the drug paraphernalia charge, received a six-month deferred sentence, and appealed the denial of his suppression motion under a reservation of rights to the Montana Eleventh Judicial District Court.
¶11 On appeal, the District Court, Hon. Ted 0. Lympus presiding, concluded that, under the totality of the circumstances, four uniformed police officers converging upon Hoover’s parked pickup was a constitutional seizure requiring particularized suspicion of criminal *537 activity to temporarily detain and question him. The District Court remanded back to Justice Court for an evidentiary hearing to determine whether sufficient particularized suspicion existed to justify the investigative stop. Upon hearing on remand, the Justice Court again denied Hoover’s motion to suppress, this time on the undifferentiated finding and conclusion that the officers lawfully detained and continued to question Hoover on particularized suspicion of a possible break-in, illegal drug use, and/or non-consensual sexual activity. On appeal, the District Court, Hon. Katherine Curtis presiding, affirmed the Justice Court ruling, concluding that sufficient particularized suspicion of criminal activity existed to temporarily detain Hoover for questioning prior to arrest. Hoover appeals.
STANDARD OF REVIEW
¶12 On appeal from a justice court of record, the district court functions as an intermediate appellate court confined to review of the record and questions of law. Sections 3-5-303 and 3-10-115, MCA; State v. Luke, 2014 MT 22, ¶ 9, 373 Mont. 398, 321 P.3d 70.[2] On appeal of a district court’s appellate review of a lower court ruling, we review the lower court ruling as if appealed directly to this Court without district court review. State v. Maile, 2017 MT 154, ¶ 7, 388 Mont. 33, 396 P.3d 1270. Upon independent review of the lower court record, our standard of review is whether the lower court’s findings of fact are clearly erroneous, whether its conclusions of law are correct, and, as applicable, whether the lower court abused its discretion. State v. Davis, 2016 MT 206, ¶¶ 5-6, 384 Mont. 388, 378 P.3d 1192. A lower court’s findings of fact are clearly erroneous only if not supported by substantial credible evidence, the lower court misapprehended the effect of the evidence, or we are nonetheless left with a firm and definite conviction that the lower court was simply mistaken. Maile, ¶ 8. Accordingly, our standard of review of a lower court’s denial of a motion to suppress evidence is whether the lower court’s findings of fact are clearly erroneous and whether it correctly applied the controlling law to those facts. State v. Foster, 2017 MT 118, ¶ 6, 387 Mont. 402, 394 P.3d 916; State v. Massey, 2016 MT 316, ¶ 7, 385 Mont. 460, 385 P.3d 544. We generally defer to a lower court’s findings of fact but review its conclusions of law and application of legal standards de novo. State v. Kaufman, 2002 MT 294, ¶ 12, 313 Mont. 1, 59 P.3d 1166.
*538 DISCUSSION
¶13 Did the Justice Court erroneously deny Hoover’s motion to suppress evidence?
¶14 The Fourth Amendment to the United States Constitution and Article II, section 11, of the Montana Constitution both protect individuals from unreasonable government searches and seizures. As a procedural component of these protections, government searches and seizures must generally occur pursuant to a judicial warrant issued on probable cause. See U.S. Const. amend. IV (“no Warrants” for search or seizure “shall issue, but upon probable cause, supported by Oath or affirmation, particularly describing the place to be searched, and the person or things to be seized”) and Mont. Const. art. II, section 11 (“No warrant to search any place, or seize any person or thing shall issue ... without probable cause”). Except for certain limited exceptions to the warrant requirement, warrantless searches and seizures are per se unreasonable under the Fourth Amendment and Montana Constitution, Article II, section 11. State v. Hardaway, 2001 MT 252, ¶ 36, 307 Mont. 139, 36 P.3d 900; State v. McCarthy, 258 Mont. 51, 55, 852 P.2d 111, 113 (1993); Ante v. United States, 389 U.S. 347, 358, 88 S. Ct. 507, 515 (1967). The fundamental purposes of the Fourth Amendment and Article II, section 11, are “to protect the privacy and security of individuals” from unreasonable government intrusion or interference. State v. Clayton, 2002 MT 67, ¶ 11, 309 Mont. 215, 45 P.3d 30; accord United States v. Mendenhall, 446 U.S. 544, 553-54, 100 S. Ct. 1870, 1877 (1980) (purpose of Fourth Amendment “not to eliminate all contact between the police and citizenry”—only “to prevent arbitrary and oppressive” government interference with individual privacy and security) (internal quotation marks omitted).
¶15 A constitutional seizure of a person occurs when a government officer “in some way” restrains a person’s liberty “by means of physical force” or a “show of authority” that, under the totality of the circumstances, would cause an objectively reasonable person to feel not free to leave the presence of the government officer. Clayton, ¶ 12 (citing Mendenhall, 446 U.S. at 552-54, 100 S. Ct. at 1876-77); accord State v. Roberts, 1999 MT 59, ¶ 16, 293 Mont. 476, 977 P.2d 974 (citing Mendenhall); Terry v. Ohio, 392 U.S. 1, 16, 88 S. Ct. 1868, 1877 (1968) (seizure occurs whenever police accost an individual and restrain *539 freedom to walk away).[3] Even a brief restraint of a person’s liberty constitutes a seizure subject to the Fourth Amendment and Montana Constitution, Article II, section 11. Massey, ¶ 9; State v. Martinez, 2003 MT 65, ¶ 20, 314 Mont. 434, 67 P.3d 207; Kaufman, ¶ 14; State v. Reynolds, 272 Mont. 46, 49, 899 P.2d 540, 542 (1995); United States v. Cortez, 449 U.S. 411, 417, 101 S. Ct. 690, 694-95 (1981).[4] A law enforcement traffic stop is a constitutional seizure subject to the protections of the Fourth Amendment and Montana Constitution, Article II, section 11. State v. Jarman, 1998 MT 277, ¶ 9, 291 Mont. 391, 967 P.2d 1099.
¶16 In this case, the District Court concluded, and the State does not contest, that the officers constitutionally seized Hoover at the time that they converged on foot on both sides of his parked vehicle, shined a flashlight into the open passenger window, and announced their presence as law enforcement officers. We thus confine our review to the initial and continued constitutional validity of the seizure and escalating investigation that ultimately resulted in Hoover’s arrest, which then resulted in an otherwise lawful search incident to arrest and the discovery of his possession of illegal drug paraphernalia.
¶17 As a limited exception to the warrant requirement, a law enforcement officer may stop and temporarily detain a person for investigative purposes without probable cause for an arrest if, based on specific and articuable facts known to the officer, including rational inferences therefrom based on the officer’s training and experience, the officer has an objectively reasonable, particularized suspicion that the person is engaged, or about to engage, in criminal activity. State v. Elison, 2000 MT 288, ¶ 15, 302 Mont. 228, 14 P.3d 456; Roberts, ¶ 12; *540 Reynolds, 272 Mont. at 49-50, 899 P.2d at 542; State v. Gopher, 193 Mont. 189, 193-94, 631 P.2d 293, 295-96 (1981); Cortez, 449 U.S. at 417-18, 101 S. Ct. at 694-95; Terry, 392 U.S. at 16-19, 88 S. Ct. at 1877-79. Relevant considerations include the quantity, substance, quality, and degree of reliability of information known to the officer. State v. Pratt, 286 Mont. 156, 161, 951 P.2d 37, 40 (1997); Alabama v. White, 496 U.S. 325, 330, 110 S. Ct. 2412, 2416 (1990).[5] In 1991, the Legislature codified the Fourth Amendment particularized suspicion standard articulated in Terry, Cortez, and Gopher, to wit:
In order to obtain or verify an account of the person’s presence or conduct or to determine whether to arrest the person, a peace officer may stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense.
Section 46-5-401(1), MCA (1991 Mont. Laws 3027). See also State v. Bar-Jonah, 2004 MT 344, ¶ 42, 324 Mont. 278, 102 P.3d 1229 (noting codification of constitutional principles). The question of whether an officer had a particularized suspicion of criminal activity is a question of fact under the totality of circumstances, but the related question of whether the circumstances indicated activity that was illegal is a question of law. Kaufman, ¶ 11; Cortez, 449 U.S. at 417-18, 101 S. Ct. at 695.
¶18 The particularized suspicion standard does not require that an officer be certain, or even ultimately correct, that a person is engaged in criminal activity. See State v. Thomas, 2008 MT 206, ¶ 10, 344 Mont. 150, 186 P.3d 864; State v. Henderson, 1998 MT 233, ¶ 12, 291 Mont. 77, 966 P.2d 137, Gopher, 193 Mont. at 192, 631 P.2d at 295; Cortez, 449 U.S. at 418, 101 S. Ct. at 695. However, particularized suspicion requires more than mere generalized suspicion or an undeveloped hunch of criminal activity. Illinois v. Wardlow, 528 U.S. 119, 123-24, 120 S. Ct. 673, 676 (2000); Terry, 392 U.S. at 27, 88 S. Ct. at 1883. See also State v. Strom, 2014 MT 234, ¶¶ 14-17, 376 Mont. 277, 333 P.3d 218 (daytime observation of occupied vehicle legally parked alone in public-use area near oft-vandalized war memorial insufficient for particularized suspicion of criminal activity); Jarman, ¶¶ 14-15 (mere *541 presence in phone booth in high crime area on cold night insufficient particularized suspicion of criminal activity); Reynolds, 272 Mont. at 49-51, 899 P.2d at 542-43 (mere suspicion of “possible” traffic violation “combined with no other objective data” insufficient to justify investigatory stop); Brown v. Texas, 443 U.S. 47, 50-53, 99 S. Ct. 2637, 2640-41 (1979) (generalized observation that person looked suspicious in “neighborhood frequented by drug users” insufficient to justify investigative stop).
¶19 Here, Sgt. Meredith, a highly experienced officer on patrol in a commercial area, reasonably took note of an occupied, unlit vehicle parked late at night in the dark in a relatively secluded location near the back of a private mini-storage complex off of a busy highway. Under these circumstances and based on his extensive law enforcement experience, Meredith certainly articulated a reasonable suspicion that an illegal break-in might possibly be in progress, thus warranting additional investigation in the performance of his official duty. But, without observation or knowledge of additional facts, this initial suspicion was, as yet, no more than an undeveloped, generalized suspicion of criminal activity. For this undeveloped suspicion to ripen into an objectively reasonable, particularized suspicion of criminal activity, the officers needed additional “specific and articuable facts” indicating that the occupants of the vehicle had committed, were committing, or were about to commit a specific criminal offense. Section 46-5-401(1), MCA; Elison, ¶ 15; Roberts, ¶ 12; Reynolds, 272 Mont. at 49-50, 899 P.2d at 542; Gopher, 193 Mont. at 193-94, 631 P.2d at 295-96; Cortez, 449 U.S. at 417-18, 101 S. Ct. at 694-95; Terry, 392 U.S. at 16-19, 88 S. Ct. at 1877-79.
¶20 The quantum or quality of information available to the officers in this case did not significantly increase or improve as they walked up to the parked vehicle from the rear. Prior to shining a flashlight into the cab through the open passenger window, the officers had still observed no more than a legally parked vehicle, non-specific movement in the cab, two people sitting apart in the front seats, the passenger side window down, and the driver looking down toward his lap or the steering wheel. However reasonable as far as it went, Sgt. Meredith’s general awareness that people typically engage in illegal drug use in secluded places was not further supported by any articulation of a more specific observation, sound, odor, or other evidence, information, or circumstance particularly indicative of illegal drug use, much less a storage unit break-in. The officers’ initial generalized suspicions simply did not ripen into any articuable particularized suspicion of a break-in or illegal drug use. Despite ample opportunity for further *542 surveillance or other efforts to at least attempt to develop additional facts sufficient for a particularized suspicion of criminal activity, the officers jumped the gun and prematurely set out to effect a constitutional seizure as the investigative means to confirm or dispel their as-yet only generalized suspicion of criminal activity.
¶21 The State attempts to favorably compare the facts of this case to those in State v. Rodriguez, 2011 MT 36, 359 Mont. 281, 248 P.3d 850. In Rodriguez, two sheriffs deputies were on patrol in a commercial area in Missoula when they noticed an unlit pickup slowly rolling though the parking lot of a recreational vehicle dealership around midnight. Rodriguez, ¶ 3. The dealership was not open for business and maintained “large quantities of expensive merchandise” onsite. Rodriguez, ¶ 3. The officer specifically articulated that he knew from experience that business burglaries typically occur at night, vehicles were typically never present in the parking lot of that particular business at night, and the vehicle was creeping along very slowly without lights, similar to a vehicle casing a closed business in advance of a burglary. Rodriguez, ¶¶ 3,13, and 19. Under those circumstances, we held that the officers had sufficient particularized suspicion that the occupant of the vehicle was about to commit a burglary. Rodriguez, ¶¶ 13 and 19.
¶22 Here, unlike in Rodriguez, the mini-storage complex at issue was not closed for business. Though a business not typically frequented by renters around midnight, the complex was nonetheless an ungated, self-service operation, open to the public around the clock for that purpose. Moreover, in Rodriguez, the officer articulated specific conduct that, under the totality of the circumstances based on the officer’s training and experience, was particularly indicative of specific criminal activity, i.e., casing a closed business in advance of a burglary. Here, though he articulated circumstances generally conducive to the commission of a break-in or illegal drug use, Sgt. Meredith did not further articulate any specific conduct or circumstance which, in context of his articulated generalized suspicion, was particularly indicative of an imminent break-in or illegal drug use. Rodriguez is not sufficiently analogous and, thus, factually distinguishable here.
¶23 Glossing over the manifest absence of any articulation of specific facts sufficient to further develop the officers’ initial suspicions of a possible break-in or illegal drug use beyond mere generalized suspicion or a hunch, the State asserts that the subsequent observation of Hoover masturbating in the presence of a female in a secluded area justified additional intrusion to dispel a new or broadened suspicion of possible nonconsensual sexual activity, i.e., sexual intercourse without *543 consent or indecent exposure. We certainly recognize that, based on additional information developed during the lawful duration and scope of an initial investigative stop, new or broader particularized suspicion of criminal activity may develop and thus permissibly expand the duration and scope of the stop beyond its initial purpose. State v. Case, 2007 MT 161, ¶ 34, 338 Mont. 87, 162 P.3d 849; State v. Carlson, 2000 MT 320, ¶ 21, 302 Mont. 508, 15 P.3d 893; Hulse v. State, 1998 MT 108, ¶¶ 40-42, 289 Mont. 1, 961 P.2d 108; State v. Sharp, 217 Mont. 40, 46, 702 P.2d 959, 963 (1985). We further recognize that, within the framework of constitutional reasonableness, a compelling government interest in “effective law enforcement” demands that officers in the field have “some latitude” to reach, follow up on, and confirm or dispel initial suspicions of criminal activity. Sharp, 217 Mont. at 47, 702 P.2d at 963; see also State v. Seaman, 2005 MT 307, ¶ 29, 329 Mont. 429, 124 P.3d 1137 (citing Sharp in community caretaker context). However, an investigative stop simply cannot lawfully ripen or escalate into new or broader particularized suspicion of criminal activity unless sufficient particularized suspicion of criminal activity exists to justify a stop in the first place and then continues to exist prior to the development of the additional information on which an officer relies to prolong and expand its scope. See Hulse, ¶ 40-42 (escalating suspicion must arise from initial lawful stop); § 46-5-403, MCA (investigative stop “may not last longer than is necessary to effectuate the purpose of the stop”).[6]
¶24 In State v. Graham, 2007 MT 358, 340 Mont. 366, 175 P.3d 885, a Yellowstone County sheriffs deputy was on patrol during daylight hours on a county road on the outskirts of Billings when she saw a pickup legally parked on an unpaved pullout located along and in plain view of the road. Graham, ¶ 2. Present in the pickup were two adults, a man and a woman later determined to be common law spouses. *544 Graham, ¶ 2. Because the deputy did not usually see vehicles parked in that area, she decided to investigate further to determine whether the couple had mechanical problems. Graham, ¶ 2. As she drove by on the road, the deputy initially saw the fully clothed couple kissing passionately in the pickup and then saw the female attempt “to mount” the male. Graham, ¶ 3. She then circled back, activated her emergency top lights, pulled in behind the parked pickup, and approached on foot to “discourage... their inappropriate behavior” and “move them along.” Graham, ¶ 3 (internal quotation marks omitted). Though the deputy “surmised” that various violations of law could possibly occur in that scenario, “she observed none” prior to stopping and approaching the vehicle on foot. Graham, ¶ 16.
¶25 As she walked up to the vehicle, the deputy observed “a cold sweaty beer can outside the driver’s door” and then saw through the window for the first time that the female’s “pants were undone” and that the male’s pants “were partly pulled down his legs, with his waistband underneath his bottom.” Graham, ¶ 4. When the deputy asked what they were doing, the couple replied that they were “just kissing.” Graham, ¶ 4. The deputy then asked them for identification and, while speaking with them, noticed an alcoholic odor on the male’s breath. Graham, ¶ 4. Further questioning led to field sobriety testing and, ultimately, the male’s arrest and conviction for driving under the influence. Graham, ¶ 4.
¶26 On appeal, the State argued that the deputy had sufficient particularized suspicion to justify the initial stop based on the possibility of “indecent exposure, sexual assault, sexual intercourse without consent, or sexual abuse of a child.” Graham, ¶¶ 18-19. Noting that the deputy saw no particularized indication of any of those offenses, we affirmed the district court’s ruling that she lacked sufficient particularized suspicion of criminal activity to justify the stop. Graham, ¶¶ 16-19. We noted that “[a]ny particularized suspicion” arose “only after” the deputy seized the couple and that any post-seizure observations “could not form a basis for particularized suspicion justifying the seizure in the first place.” Graham, ¶ 20.
¶27 In Kaufman, after observing a vehicle with unequal tail light brightness at night on Interstate 90, a sheriffs deputy stopped the vehicle on suspicion of violation of § 61-9-204(1), MCA (requirement for two properly functioning tail lights). Kaufman, ¶¶ 6-7 and 16-19. The deputy had earlier followed the vehicle for several miles after observing *545 a number of other suspicious circumstances.[7] Kaufman, ¶¶ 6-7. However, as the vehicle pulled over, the deputy saw that its tail and brake lights were in fact functioning properly. Kaufman, ¶ 8. Instead of breaking off the encounter, the officer completed the stop, approached on foot, and advised the driver that he stopped him for what appeared to an equipment violation. Kaufman, ¶ 8. The deputy then advised that it was no “big deal” but recommended that the driver have his brake lights checked. Kaufman, ¶ 8. The deputy then asked for the driver’s license and vehicle registration, questioned the driver “about the car’s ownership,” and inquired about the occupants’ “reasons for traveling on the Interstate that night.” Kaufman, ¶ 8. The extended detention and questioning ultimately led to the discovery of two ounces of methamphetamine and the occupants’ arrests. Kaufman, ¶ 2. On appeal, we reversed the district court’s denial of the defendants’ motions to suppress, holding that any reasonable suspicion that the officer “may have had that the lighting system was malfunctioning” completely evaporated “prior to the actual stop.” Kaufman, ¶ 20. We concluded that, since the officer no longer had any particularized suspicion of criminal activity “to justify further investigation by the time” he stopped the vehicle, no legal basis existed for further detention and questioning about its ownership or the occupants’ reasons for being on the road that night.[8] Kaufman, ¶ 25.
¶28 The foundation of the State’s cascading theory of particularized suspicion is similarly unsound here. Before the four uniformed officers appeared out of the dark and seized Hoover and his companion, they had no more than an undeveloped generalized suspicion or hunch of a possible break-in or illegal drug activity. As in Kaufman and Graham, even that initial generalized suspicion instantly evaporated the moment they shined a flashlight through the *546 open passenger window and clearly saw exactly what Hoover and his companion were doing and no particularized indication of a possible break-in or illegal drug use. With their initial asserted justification gone, the officers neither saw nor articulated any particularized indication of anything other than lawful sexual activity between consenting adults. Reasonable or not, the officers’ belief that adults generally do not engage in consensual sexual activity in vehicles falls far short of what is necessary for an objectively reasonable, particularized suspicion of illegal sexual activity. As in Graham and Kaufman, the officers’ post-seizure observations could not in any event form a lawful basis for particularized suspicion justifying the stop in the first place. Based on our independent review of the record, we hold that the Justice Court’s ultimate finding that the officers had an objectively reasonable particularized suspicion that Hoover was engaged, or about to engage in, a storage unit break-in, illegal drug use, or nonconsensual sexual activity was clearly erroneous as a matter of fact.
CONCLUSION
¶29 The Fourth Amendment “protects people, not places.” Terry, 392 U.S. at 9, 88 S. Ct. at 1873 (quoting Katz, 389 U.S. at 351, 88 S. Ct. at 511). The right to be free from unreasonable searches and seizures is an “inestimable right of personal security [that] belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs.” Terry, 392 U.S. at 8-9, 88 S. Ct. at 1873. The Fourth Amendment protects people “from unreasonable governmental intrusion” wherever they may have a “reasonable expectation of privacy.” Terry, 392 U.S. at 9, 88 S. Ct. at 1873 (citing Katz, 389 U.S. at 351, 88 S. Ct. at 511); accord Reynolds, 272 Mont. at 49, 899 P.2d at 542-43. Montana Constitution Article II, sections 10 and 11, even more explicitly protect Montanans from government intrusion wherever they have a reasonable expectation of privacy. E.g. Hardaway, ¶¶ 31-34 (Mont. Const. art. II, section 10, right to privacy “is the cornerstone” of the section 11 right to be free from unreasonable searches and seizures). “No right is held more sacred” or should be more carefully guarded “than the right of every individual to the possession and control of his own person, free from all [government] restraint or interference” except as permitted by “clear and unquestionable authority of law.” Terry, 392 U.S. at 8-9, 88 S. Ct. at 1873.
¶30 The State does not contest on appeal that Hoover had a reasonable expectation of privacy or that the officers constitutionally *547 seized him when they converged on his pickup from the dark, shined a flashlight into the open passenger side window, and began asking questions. On the limited evidentiary record in this case, the officers had no more than a generalized suspicion that Hoover might possibly be engaged, or about to engage, in criminal activity. In the manifest absence of more specific and articulable facts and law enforcement inferences, the Justice Court erroneously concluded that the officers had an objectively reasonable particularized suspicion that Hoover had committed, was committing, or was about to commit a criminal offense. We hold that the Justice Court erroneously denied Hoover’s motion to suppress evidence obtained subsequent to his seizure. Hoover’s conviction on the offense of Criminal Possession of Drug Paraphernalia, a misdemeanor in violation of § 45-10-103, MCA, is hereby reversed.
CHIEF JUSTICE McGRATH, JUSTICES WHEAT and SHEA concur.

 Other than an alcoholic breath odor, the record is silent as to what quantum of suspicion, if any, the officers had to request that Hoover submit to a PBT test. See Hulse v. State, 1998 MT 108, ¶¶ 30-38, 289 Mont. 1, 961 P.2d 108 (field sobriety tests infringe reasonable expectation of privacy and constitute a search requiring particularized suspicion of DUI); § 61-8-409(1), MCA (implied consent PBT on particularized suspicion of DUI); and Bramble v. State, 1999 MT 132, ¶ 29, 294 Mont. 501, 982 P.2d 464 (lack of particularized suspicion for field sobriety tests similarly constitutes lack of particularized suspicion for PBT). See also, § 61-8-406(1)(a), MCA (0.08% threshold for unlawful blood or breath alcohol concentration).

 The Flathead County Justice Court is a court of record as defined by § 3-10-101(5), MCA.

 A constitutional “search” is the “use of some means of’ examining or gathering evidence “which infringes upon a person’s reasonable expectation of privacy.” State v. Carlson, 198 Mont. 113, 119, 644 P.2d 498, 501 (1982); accord Smith v. Maryland, 442 U.S. 735, 739-40, 99 S. Ct. 2577, 2579-80 (1979). A search infringes upon an individual’s right to privacy while a seizure “deprives the individual of dominion over his or her person or property.” State v. Loh, 275 Mont. 460, 468, 914 P.2d 592, 597 (1996) (quoting Horton v. California, 496 U.S. 128, 133, 110 S. Ct. 2301, 2306 (1990)); accord State v. Scheetz, 286 Mont. 41, 46, 950 P.2d 722, 724 (1997) (government infringement of a reasonable expectation of privacy constitutes a search). No search or seizure occurs absent government infringement of a reasonable expectation of privacy. Scheetz, 286 Mont. at 46, 950 P.2d at 724.

 See also § 45-2-101(73), MCA (defining a “stop” as “the temporary detention of a person that results when a peace officer orders the person to remain in the peace officer’s presence”).

 Upon challenge in a criminal proceeding, the State has the burden of proving that an officer had an objectively reasonable, particularized suspicion of criminal activity. State v. Waite, 2006 MT 216, ¶ 11, 333 Mont. 365, 143 P.3d 116; State v. Angeline, 1998 MT 139, ¶ 22, 289 Mont. 222, 961 P.2d 1251; Gopher, 193 Mont. at 194, 631 P.2d at 296.

 Section 46-5-403, MCA, is a 1991 codification of Fourth Amendment principles enunciated in United States v. Sharpe, 470 U.S. 675, 686, 105 S. Ct. 1568, 1575 (1985) (police must act diligently to quickly confirm or dispel predicate suspicion for an investigative stop); Florida v. Royer, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325-26 (1983) (duration and scope of investigative stop “must be carefully tailored to its underlying justification” and may not exceed what is reasonably “necessary to effectuate” its initial purpose); and Terry, 392 U.S. at 17-20, 88 S. Ct. at 1878-79 (warrantless investigative seizure and search reasonable only if based on particularized suspicion of criminal activity and the ensuing investigative detention is “strictly tied” and “reasonably related in scope” to the initial justification). See also Carlson, ¶ 21 (citing § 46-5-403, MCA, and Royer, 460 U.S. at 500, 103 S. Ct. at 1325).

 The officer testified that he first became suspicious when he earlier saw that the occupants were 20-30 years old, ran a vehicle records check that indicated that the registered owner was a 74-year-old man, and saw one of the occupants conspicuously refused to make eye contact with him when he looked directly at her as he drove by. Kaufman, ¶ 5. While subsequently following the vehicle for several miles, he further observed it moving at a slow rate of speed, swerve over the fog line, and drive on the painted center line. Kaufman, ¶ 6.

 See similarly, Martinez, ¶ 74 (lawful duration and scope of an investigative stop based on suspicion of expired temporary registration sticker ended when officer stopped and walk-up to vehicle, read the sticker, and saw that temporary registration was still valid prior to contacting occupants).