Chief Justice Mike McGrath delivered the Opinion of the Court.
***240 ¶ 1 Johnathan Samual Wilson appeals from a February 17, 2017 Seventeenth Judicial District Court Order in which his motion to suppress was denied. We reverse.
¶ 2 We restate the issue on appeal as follows:
Did the District Court err when it denied Wilson's motion to suppress based on its determination that the drug investigation was supported by particularized suspicion?
FACTUAL AND PROCEDURAL BACKGROUND
¶ 3 The relevant facts are not in dispute. On June 21, 2016, at approximately 5:06 p.m. Montana Highway Patrolman Cody Smith ("Smith"), while in his marked patrol car on the eastbound shoulder of U.S. Highway 2 near Chinook, Montana, observed an eastbound 2013 Chrysler LX with a North Dakota license plate approaching from the rear. According to Smith, the occupants of the vehicle looked at Smith's patrol car and then immediately looked away. Smith found this behavior suspicious. He ran the North Dakota license plate, which showed that the vehicle's registration had expired. Smith initiated a traffic stop.
¶ 4 Smith approached the driver's side of the vehicle and informed the driver of the reason for the stop. The driver, later identified as Scott Dean Paramore, seemed surprised to learn that the registration had expired. Smith noted that Paramore was trembling and that the passenger, Johnathan Wilson, appeared nervous and avoided eye contact with Smith. Smith found their nervousness unusual. Smith then noticed a rental sticker in the rear passenger window, *80 a suitcase in the back seat, and that the vehicle had a "somewhat lived in appearance."
¶ 5 Paramore informed Smith that he had borrowed the vehicle from a work acquaintance. Paramore could not locate his wallet or driver's license and told Smith he must have left them at a gas station. Smith asked Paramore to step out of the vehicle and instructed him to sit in the front passenger seat of his patrol car. As they walked to the patrol car, Paramore handed Smith an expired insurance card and placed an unlit cigarette in his mouth. Smith found this odd considering "he knew he was going to go into my car, and he had a cigarette in his mouth."
¶ 6 In the patrol car, Paramore informed Smith that he and Wilson were returning home to North Dakota from Paramore's wedding in Sandpoint, Idaho. Smith found it suspicious that Paramore, a newlywed, was traveling without his wife and asked Paramore and Wilson about the arrangement five separate times. Each time, ***241 Paramore informed Smith that his wife needed to arrive early to Idaho to get the wedding set up, that he only had a limited number of vacation days available, and that his wife needed a separate vehicle to transport their three children. Smith noted that Paramore's nerves had not subsided because he was breathing heavily and avoiding eye contact with Smith.
¶ 7 Smith ran Paramore's license and learned that Paramore had a valid Idaho license showing several driving infractions. Smith asked Paramore how long he had known the vehicle's owner, to which he responded about four or five months. Smith found it suspicious that a person would loan their vehicle to someone whom the person knew for less than six months, especially for an interstate trip lasting several days.
¶ 8 Smith exited the patrol car to see if Wilson could locate valid proof of insurance. As he did so, Paramore asked Smith if he could step out of the car to smoke his cigarette. Smith interpreted this as nervousness and indicative of Paramore's desire to get out of the patrol car.
¶ 9 As Smith approached the vehicle's passenger's side door he noted that Wilson did not appear nervous. He observed old food items on the floor and the overall messiness of the vehicle. He asked Wilson if he could find valid proof of insurance, which Wilson was unable to locate. Wilson corroborated the plans Paramore discussed with Smith: they were returning from Paramore's wedding in Idaho, the bride traveled separately, and the vehicle belonged to Paramore's coworker. Smith returned to the patrol car with Wilson's driver's license.
¶ 10 Back in the patrol car, dispatch checked Paramore and Wilson's criminal history and informed Smith that Paramore had a history of prior drug charges. Smith asked Paramore if he had ever been on probation, to which Paramore responded that he was on probation two years ago for marijuana.
¶ 11 At approximately 5:24 p.m., about twenty minutes after the stop was initiated, Smith exited the vehicle to call and request that Nicolas Ost, a border patrol agent and K-9 handler, bring his dog to assist in the investigation. As Smith was on the radio, Paramore opened the patrol car door. Smith interpreted this as Paramore's attempt to "listen to what [he] was doing." According to Smith, "[t]his continued to make me suspect that Paramore was extremely nervous."
¶ 12 At approximately 5:27 p.m., Smith issued Paramore citations for failure to provide proof of insurance and for operating a vehicle with expired registration.
¶ 13 Smith asked Paramore if he was "good to go" and Paramore responded affirmatively. However, before Paramore could exit the vehicle, Smith requested that Paramore stay for further questioning.
***242 Smith informed Paramore that U.S. Highway 2 is a known drug trafficking corridor and asked whether there were any drugs in the vehicle. Paramore denied that any drugs were in the vehicle.
¶ 14 Smith asked Paramore if he could search the vehicle. Paramore refused. Smith asked Paramore if he would be willing to wait for a K-9 unit to arrive. Paramore stated that he would prefer not to wait. Smith responded that a canine search of the vehicle was going to take place and that they needed to wait for the K-9 unit to arrive.
*81 ¶ 15 At 5:51 p.m., approximately 45 minutes after Paramore and Wilson were initially stopped, the K-9 unit arrived. After the canine sniff of the vehicle, Agent Ost notified Smith that the dog detected drugs in the car. Smith informed Wilson and Paramore that, due to the dog's alerts, Smith would be applying for a warrant to search the vehicle.
¶ 16 Smith asked about the bar code in the rear window of the vehicle and Paramore explained that he believed the sticker was there because it used to be rental car. Smith found the sticker "really weird" and stated that it reinforced his suspicions.
¶ 17 At 6:02 p.m., Wilson and Paramore were permitted to leave the scene on foot while Smith awaited the warrant.
¶ 18 A search warrant was issued and officers recovered a small bag of marijuana and a pipe from the vehicle's center console, and a large bag containing two bags of marijuana in the trunk for a total of 262.2 grams of marijuana. Paramore and Wilson were later arrested in Havre, Montana, and transported to Hill County Detention Center.
¶ 19 Wilson was charged with Criminal Possession of Dangerous Drugs with Intent to Distribute, a felony, in violation of § 45-9-103, MCA ; Criminal Possession of Dangerous Drugs, a felony, in violation of § 45-9-102(1), MCA ; and Criminal Possession of Drug Paraphernalia, a misdemeanor, in violation of § 45-10-103, MCA. Wilson filed a motion to suppress the evidence gathered from the vehicle. The District Court denied the motion on the basis that Smith had sufficient facts to expand the traffic stop into a drug investigation and particularized suspicion to justify a canine search of the vehicle's exterior.
¶ 20 On September 12, 2017, Wilson pleaded No Contest to Criminal Possession of Dangerous Drugs, a felony, and the District Court imposed a one-year deferred sentence and a $2,295.13 fine.
STANDARD OF REVIEW
¶ 21 We review a district court's grant or denial of a motion to suppress to determine whether the court's findings are clearly erroneous and whether those findings were applied correctly as a matter of law.
***243 State v. Gill , 2012 MT 36, ¶ 10, 364 Mont. 182, 272 P.3d 60. A district court's finding that particularized suspicion exists is a question of fact which we review for clear error. Gill , ¶ 10 (citing City of Missoula v. Moore , 2011 MT 61, ¶ 10, 360 Mont. 22, 251 P.3d 679 ). A finding is clearly erroneous if it is not supported by substantial evidence, if the lower court has misapprehended the effect of the evidence, or if our review of the record leaves us with the firm conviction that a mistake has been made. Gill , ¶ 10.
DISCUSSION
¶ 22 Did the District Court err when it denied Wilson's motion to suppress based on its determination that the drug investigation was supported by particularized suspicion?
¶ 23 Wilson asserts that the circumstances did not justify a canine sniff of the vehicle because there was no particularized suspicion of narcotics activity.
¶ 24 The State argues that Trooper Smith's extension of the traffic stop into a drug investigation, and the accompanying delay, were lawful because Smith had particularized suspicion to believe that Wilson and Paramore were engaged in illegal drug activity.
¶ 25 The Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution protect persons against unreasonable searches and seizures, including brief investigatory stops such as traffic stops. State v. Elison , 2000 MT 288, ¶ 15, 302 Mont. 228, 14 P.3d 456. The fundamental purpose of the Fourth Amendment and Article II, Section 11, is "to protect the privacy and security of individuals" from unreasonable government intrusion or interference. State v. Hoover , 2017 MT 236, ¶ 14, 388 Mont. 533, 402 P.3d 1224 (citing State v. Clayton , 2002 MT 67, ¶ 11, 309 Mont. 215, 45 P.3d 30 ). To initiate a traffic stop, a law enforcement officer must have particularized suspicion that the occupant of the vehicle is or has been engaged in unlawful behavior. Section 46-5-401, MCA. A traffic stop may not last longer than is necessary to effectuate the purpose of the stop.
*82 Section 46-5-403, MCA. However, a stop may be prolonged and the scope of the investigation may be broadened if the investigation remains within the limits created by the facts and the suspicions from which they arose. State v. Meza , 2006 MT 210, ¶ 23, 333 Mont. 305, 143 P.3d 422 ; Rodriguez v. United States , 575 U.S. ----, 135 S.Ct. 1609, 1614-15, 191 L.Ed.2d 492 (2015). The justification for a stop may change as officers acquire additional information. State v. Estes , 2017 MT 226, ¶ 15, 388 Mont. 491, 403 P.3d 1249 (citing State v. Carlson , 2000 MT 320, ¶ 21, 302 Mont. 508, 15 P.3d 893 ).
¶ 26 A canine sniff of a vehicle constitutes a search under Article II, Sections 10 and 11 of the Montana Constitution. Meza , ¶ 22 ;
***244 State v. Tackitt , 2003 MT 81, ¶ 22, 315 Mont. 59, 67 P.3d 295. However, due to the minimally intrusive nature of a canine sniff, it does not require the issuance of a warrant. Instead, only particularized suspicion is a prerequisite. Tackitt , ¶ 31.
¶ 27 Smith had particularized suspicion to make the initial traffic stop when dispatch notified him that the vehicle's registration had expired. Estes , ¶ 17.
¶ 28 However, before Smith could extend the stop and conduct a canine search, he needed particularized suspicion that Paramore or his vehicle were involved in narcotics activity. Particularized suspicion is objective data from which an experienced police officer can make certain inferences and a resulting suspicion that the occupant of the vehicle is or has been engaged in wrongdoing. Elison , ¶ 15. Relevant considerations include the quantity, substance, quality, and degree of reliability of information known to the officer. Hoover , ¶ 17. Whether particularized suspicion exists is a question of fact determined by examining the totality of the circumstances, but the related question of whether the circumstances indicated activity that was illegal is a question of law. Hoover , ¶ 17 ; Meza , ¶ 25. This standard does not require that an officer be certain, or even correct, that a person is engaged in criminal activity. Hoover , ¶ 18. However, particularized suspicion requires more than mere generalized suspicion or an undeveloped hunch of criminal activity. Hoover , ¶ 18.
¶ 29 The State argues that the District Court's finding of particularized suspicion should be upheld because the facts of this case are indistinguishable from those in Estes . We disagree.
¶ 30 In Estes , we held that an officer had particularized suspicion to expand a routine traffic stop into a drug investigation. In that case, the officer noticed that the driver had food wrappers and energy drink bottles strewn around and a sleeping bag in the back seat covering a cardboard box-which suggested to the officer that the driver wanted to get from point A to point B quickly. The driver also had two cell phones, even though he was the only person in the vehicle, as well as cash in the center console. Estes , ¶ 18. The officer further detected an overwhelming odor from multiple air fresheners as he approached the vehicle, a common tactic used to mask the scent of narcotics according to his experience. Further, the driver appeared unusually nervous for an expired registration stop which occurred late at night in a known "source and destination" area for drug traffic. Estes , ¶ 18. In light of the officer's considerable experience and his ability to point to conduct that appeared objectively suspicious, we affirmed the district court's finding of particularized suspicion. Estes , ¶ 20.
¶ 31 We agree that that there are similarities between Estes and this ***245 case: Smith noted the disheveled nature of Paramore's vehicle and Paramore was nervous and sometimes shaky. He avoided making eye contact and had a prior criminal history involving drugs. However, there are significant differences in the facts.
¶ 32 Smith testified that Paramore's nerves were "at a different level" than what he typically sees during a traffic stop. Smith noted that Paramore was breathing heavily and found it strange that Paramore brought an unlit cigarette into Smith's squad car. The State emphasizes that Paramore and Wilson avoided prolonged eye contact with Smith throughout the duration of the stop and that the vehicle was borrowed from someone Paramore had only known for several months.
*83 ¶ 33 The State also relies upon Paramore's "bizarre" travel plans to substantiate particularized suspicion. We do not find the fact that Paramore was traveling without his wife peculiar, nor do we believe that these plans can be used to develop particularized suspicion in this instance. Following repeated questioning from Smith, Paramore stated that he and his wife traveled in separate vehicles because she needed to arrive at the wedding early to set up, he had to return to work early, and because she was traveling with their children. Wilson also independently corroborated these facts to Smith.
¶ 34 Smith testified that during the stop he was "compounding ... indicators on top of each other." Although a driver's post-stop behavior may, in combination with more objectively incriminating behavior, amount to particularized suspicion, this conduct alone did not meet the minimum threshold. A messy vehicle, a nervous driver with an unlit cigarette, daylight use of a Montana highway, using a borrowed vehicle, and the fact that newlyweds aren't traveling together following their wedding does not amount to particularized suspicion. Our review of Smith's indicators reveals only a generalized hunch and not an articulation of specific facts demonstrating criminal behavior.
¶ 35 Significantly, Smith failed to identify details that were objectively indicative of illegal drug activity. In Estes , the officer noted the overwhelming smell of numerous air fresheners, and observed in plain view two cell phones and a stack of cash in the console. Estes , ¶ 18. Smith did not identify similarly incriminating conduct. We find that Estes is not sufficiently analogous and is factually distinguishable here.
¶ 36 In Montana, an investigative stop "may not last longer than is necessary to effectuate the purpose of the stop." Section 46-5-403, MCA. Our function as an appellate court is to interpret statutes according to the plain meaning of the words used. State v. Madsen , 2013 MT 281, ¶ 8, 372 Mont. 102, 317 P.3d 806.
¶ 37 Here, the purpose of the stop was to ticket Paramore for expired ***246 registration and failure to provide proof of insurance. Smith issued these citations at 5:27 p.m., just over twenty minutes after the stop was initiated. The stop should have ended there. However, Paramore and Wilson were kept at the scene for an additional thirty-five minutes until the canine sniff was finished and they were permitted to leave. Smith lacked the requisite particularized suspicion to extend the stop into a drug investigation; § 46-5- 403, MCA, required their release after the citations were issued.
CONCLUSION
¶ 38 Smith lacked the particularized suspicion required to extend the traffic stop into a drug investigation and the stop violated § 46-5-403, MCA. The extension of the stop to request a search by a K-9 unit violated the constitutional shield against unreasonable searches.
¶ 39 The conviction is reversed.
We Concur:
LAURIE McKINNON, J.
JAMES JEREMIAH SHEA, J.
BETH BAKER, J.
DIRK M. SANDEFUR, J.
INGRID GUSTAFSON, J.
¶ 40 My reading of the record leads to a different conclusion that the Court's. I agree with the District Court's denial of the motion.
¶ 41 Trooper Smith's attention was first drawn to the subject vehicle when it passed his patrol cruiser, as the driver and passenger both looked at him and then both looked away in a manner that was atypical or out of the ordinary in Smith's experience, catching Smith's attention and prompting him to check on the license plate, registered in North Dakota. By doing so, he learned the license plate was expired, and decided to initiate a stop of the vehicle.
¶ 42 Like the Trooper in State v. Estes , 2017 MT 226, ¶ 18, 388 Mont. 491, 403 P.3d 1249, Smith testified regarding his specific training related to drug interdiction, including *84 Basic and Advanced Highway Patrol and three subsequent schools focused specifically on vehicle-related drug interdiction. Smith's training regarding common observations in a drug investigation gave rise to his suspicions about the subject vehicle and its occupants, particularly when indicators were found in combination.
¶ 43 As he walked toward the vehicle, Trooper Smith noticed a rental sticker on the rear passenger side window, a suitcase on the rear seat, and a disheveled, "lived-in" interior appearance, which included the presence of fast food and energy drink. Smith testified that, in accordance with his training, these were common travel characteristics of those involved with drug trafficking and raised his suspicions, which we acknowledged about the same observations in Estes , ¶¶ 3, 18 ("food wrappers and energy drink bottles strewn around, and a sleeping bag ***247 in the back seat covering a cardboard box" were vehicle indicators of those engaged in drug trafficking).
¶ 44 As Smith engaged the occupants, the driver, Paramore, acted nervously, while the passenger, Defendant Wilson, not only acted nervously but diverted his attention to the extreme of not even watching the interaction between Paramore and Smith. Smith testified that a typical passenger "at least will be looking over and seeing what [officers] are requesting," but that Wilson, in unusual behavior, steadfastly avoided making any eye contact, which Smith regarded as suspicious. Although this behavior was not present in Estes , we have noted in other cases the lack of eye contact as an indicator in a drug stop. See State v. Charlie , 2010 MT 195, ¶¶ 25, 28, 357 Mont. 355, 239 P.3d 934.
¶ 45 Paramore could not produce a driver's license and offered to Trooper Smith, as the Court notes, an excuse of leaving his wallet at a gas station. Nor could Paramore produce proof of insurance, with Paramore explaining, as the conversation continued, that the vehicle had been borrowed from someone Paramore had known for only a few months for a nine-day, interstate road trip across Idaho, Montana, and North Dakota, on U.S. Highway 2-a route Smith testified and the District Court found to be "a known drug-trafficking corridor." Similarly, we noted in Estes that the stop occurred on a corridor between "source and destination areas for drug traffic." Estes , ¶ 18.
¶ 46 Thus, at that point, in addition to the initial personal and vehicle indicators mentioned above, Trooper Smith was dealing with a vehicle with expired license plates, a failure to carry proof of insurance in the vehicle, the driver's failure to carry a driver's license with an excuse of leaving it at a gas station, and an unusual explanation about a borrowed vehicle for an extended road trip. Similarly, expired North Dakota license plates and a borrowed vehicle owned by a third party were characteristics noted about the drug trafficking vehicle in Estes , ¶ 3, which we determined gave rise to the permissible inference that the level of nervousness by the occupants exceeded the nervousness that would normally accompany "an expired registration stop." Estes , ¶ 18.
¶ 47 The same occurred here, but even worse than in Estes . Based upon his initial observations and facts, Trooper Smith asked Paramore to step out of the vehicle and return with him to the patrol car. Smith testified concerning the typical nervousness exhibited by a driver who is stopped by police "for a minor traffic violation," explaining that such nervousness is common and ordinary, but which the behavior here exceeded. In Estes , we likewise noted the officer's observation that the Defendant "seemed inordinately nervous and was visibly shaking" as ***248 an appropriate indicator. Estes , ¶ 18. But more, Smith testified that Paramore was "jittery," and compared it to the physical shaking of a smoker who hasn't smoked for a while and "need[s] that cigarette." Thus, beyond nervousness, present here was an additional, noticeable physical condition-one described as comparable to a drug user's need for a drug. Then, in the patrol car, Paramore began breathing heavily to the point of drawing Smith's attention, while also avoiding any eye contact with Smith as they were conversing, in a manner Smith described as "extended"-extended periods that Paramore would look away.
¶ 48 Then, Smith received the data report that Paramore had a history of prior drug *85 charges. Wilson has not argued, either to this Court or to the District Court, that Paramore's drug history was irrelevant to the determination of particularized suspicion; rather, he has argued that the drug charges should be weighed less in the determination because they were misdemeanor offenses. However, the Court does not even do that: although referencing Paramore's illegal drug activities in passing as a background fact, the Court fails to discuss their significance and appears to attach no weight to them whatsoever. While past drug charges alone would not constitute particularized suspicion for a stop or to extend a stop for a drug investigation, it counts as an indicator when viewed in the totality of the circumstances. As the District Court correctly reasoned, Paramore's drug history was an appropriate factor to be considered with the other indicators. Further, it is another factor that was not present in Estes . While there were a couple indicators present in Estes that were not present here, the converse is also true, and, in my view, the basis for Smith's initiation of a drug investigation was as strong as in Estes , if not stronger.
¶ 49 Increased training has equipped law enforcement to better recognize trafficking indicators and to draw appropriate inferences from long experience in dealing with illegal activity. As Smith explained in his testimony, "most indicators are innocent in initial appearance. It's the totality of circumstances that make an indicator ... an indicator of criminal activity or not." I would add that Paramore's history of drug charges would not be considered an "innocent" indicator.
¶ 50 At the suppression hearing, Wilson's counsel argued to the District Court that Smith's determination to initiate a dog sniff of the subject vehicle was "insanity, really." Actually, it was perceptive police work based upon extensive training. I believe the District Court correctly determined that sufficient evidence existed for the extended stop, and therefore I would affirm.