FILED

03/29/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0343

DA 20-0343

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2022 MT 61

STATE OF MONTANA,

       Plaintiff and Appellee,

    v.

WILLIAM JAMES HARNING,

       Defendant and Appellant.

APPEAL FROM:     District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC 18-1356
Honorable Colette B. Davies, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Chad Wright, Appellate Defender, Jeavon Lang, Assistant Appellate Defender, Helena, Montana

    For Appellee:

        Austin Knudsen, Montana Attorney General, Bree Gee, Assistant Attorney General, Helena, Montana

        Scott D. Twito, Yellowstone County Attorney, Sarah L. Hyde, Deputy County Attorney, Billings, Montana

Submitted on Briefs: January 19, 2022

Decided: March 29, 2022

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 William James Harning ("Harning") appeals from a May 4, 2020, order in the Thirteenth Judicial District Court, Yellowstone County, affirming the Yellowstone County Justice Court's denial of his motion to suppress. We reverse and restate the issue on appeal as follows:

> *Whether particularized suspicion existed to support extending Harning's traffic stop into a drug investigation.*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶2 Harning was transporting a truck full of ceramics to an art show in Colorado on March 1, 2018, when Montana Highway Patrol ("MHP") Trooper Tyler DiGiovanna ("Trooper DiGiovanna") pulled him over for going 74 miles per hour in a 65 mile per hour zone near Billings at approximately 10:18 in the morning. On his approach to Harning's vehicle, Trooper DiGiovanna noticed several sealed cardboard boxes in the bed of the truck.

¶3 As Trooper DiGiovanna approached, Harning rolled his window down approximately three or four inches. Trooper DiGiovanna asked Harning to roll the window down farther. Harning said he did not feel comfortable doing so and declined. Trooper DiGiovanna later testified that he immediately noticed the odor of marijuana when Harning rolled his window down. Trooper DiGiovanna testified that Harning "hemmed and hawed" when asked why he felt uncomfortable and that Harning's refusal to roll the window down first led Trooper DiGiovanna to believe Harning was hiding something. He testified that he preferred a rolled-down window for better communication and that he

2

"immediately" deemed Harning's behavior "evasive" because not rolling the window down was atypical of most traffic stops. Trooper DiGiovanna did not testify to any communication issues related to the distance Harning's window was rolled down.[1]

¶4     On cross-examination, Trooper DiGiovanna conceded people might sometimes be nervous during traffic stops, but that he had "pulled people over that are nervous, and they don't act like that." Harning's behavior struck him as different and "not nervous." Trooper DiGiovanna defined his meaning of "evasive" as "when asked a question, [Harning] would not answer it immediately. He hesitated, appeared nervous. He appeared as though he was trying to pick his words carefully, which is not normal of someone being honest." On redirect, Trooper DiGiovanna explained the difference between nervous and evasive behavior was "just subtle kind of things." When asked whether he had experience differentiating the two, Trooper DiGiovanna responded, without elaboration, that he did.

¶5     Harning provided his license, registration, and insurance upon Trooper DiGiovanna's request. Due to the smell of marijuana, Trooper DiGiovanna asked Harning whether he had a medical marijuana card. Harning did not have a medical marijuana card, but admitted to smoking marijuana in Big Timber, approximately 80 miles from where Harning was stopped. Trooper DiGiovanna testified that he asked Harning whether there was marijuana in the vehicle and that Harning briefly hesitated and answered, "I have no marijuana on me," furthering Trooper DiGiovanna's determination

---

[1] The only apparent issue, captured on Trooper DiGiovanna's dashcam, arose from a plastic bag in plain view in Harning's vehicle, the contents of which Trooper DiGiovanna said he could not make out through the window. Harning informed Trooper DiGiovanna the bag contained beef jerky.

3

that Harning was hiding something. Trooper DiGiovanna later testified that, at this point, he suspected drugs were in Harning's vehicle. He cited "the odor, [Harning's] behavior, and just [Harning's] interactions" as the basis for his suspicion. He did not testify that Harning's travel plans factored into his determination.

¶6 Trooper DiGiovanna returned to his vehicle with Harning's documents, verified Harning had no outstanding warrants, and called for backup, a standard procedure for investigations involving field sobriety tests to determine whether an individual is driving under the influence ("DUI"). The record additionally indicates Harning had no prior drug charges. Trooper DiGiovanna returned to Harning's vehicle and gave Harning a warning for speeding. He testified that, upon his return to Harning's vehicle, he made the decision to conduct a drug investigation upon completion of the DUI field sobriety tests. He again cited Harning's behavior and noted the "new" smell of marijuana "wafting" from Harning's vehicle as contributing to this decision. Trooper DiGiovanna initiated the DUI investigation first to mitigate the possibility of waning impairment.

¶7 Trooper DiGiovanna asked Harning to exit the vehicle and, pursuant to the DUI investigation, patted down Harning. The patdown revealed no drugs on Harning's person. During the DUI investigation, Harning informed Trooper DiGiovanna that the boxes in his truck bed contained pottery. Trooper DiGiovanna later testified that he misheard Harning and believed Harning said the boxes contained "pot." Another MHP trooper clarified the misunderstanding. Nonetheless, after completing all the field sobriety tests pursuant to the DUI investigation, Trooper DiGiovanna determined Harning was not impaired.

4

¶8 Although Harning had received his traffic warning and was cleared of any impaired driving, Trooper DiGiovanna again asked Harning about the marijuana smell. Harning responded that there was no marijuana in the car, denied Trooper DiGiovanna's request for consent to search his vehicle, and asked whether he could leave. Trooper DiGiovanna told Harning he was not free to leave, but neither was he under arrest. Trooper DiGiovanna did not ask Harning any additional questions regarding the drug investigation and testified that the denial of consent did not factor into his preexisting suspicion of Harning.

¶9 At that point, Trooper DiGiovanna informed Harning he was beginning the drug investigation and "would be requesting a canine come and not search the vehicle, but be deployed." He informed Harning that he could either get a ride elsewhere or stay and wait for the results of the canine sniff; Harning elected to wait. After approximately 17 minutes, the canine arrived and signaled for drugs in Harning's vehicle. The total time between the initiation of the stop and the conclusion of the canine search was approximately 43 minutes. As a result of the canine search, Trooper DiGiovanna obtained a search warrant and located a glass marijuana pipe and grinder in Harning's vehicle. Harning was charged in Yellowstone County Justice Court with criminal possession of drug paraphernalia, in violation of § 45-10-103, MCA, and criminal possession of marijuana, in violation of § 45-9-102(2), MCA.[2]

¶10 Harning moved to suppress the State's evidence as the product of an illegal extension of the stop. After holding a hearing, the Justice Court denied Harning's motion

---

[2] The Yellowstone County Justice Court is a court of record authorized by § 3-10-101(5), MCA.

to suppress. In addition to the above testimony, Trooper DiGiovanna explained his training specifically related to drug interdiction, which included two eight-hour days of drug training during the MHP academy. Trooper DiGiovanna estimated he had been involved in approximately 50 cases involving drugs during his time with MHP. At the time he pulled Harning over, Trooper DiGiovanna had been an MHP Trooper for approximately one year.

¶11 The Justice Court concluded Harning had not been seized within the meaning of the Fourth Amendment and deemed the following facts sufficient to create a particularized suspicion: Harning's out-of-state license plates[3] and speeding, Harning's evasive answers, Harning's failure to roll down his window more than a few inches, the odor of marijuana, Harning's admission to smoking marijuana in Big Timber, and Harning's denial of having marijuana on his "person" when asked if there was marijuana in the vehicle. The Justice Court further concluded that Trooper DiGiovanna's initial stop was justified by Harning speeding, and Trooper DiGiovanna "learned that [Harning] had smoked marijuana while on his route to Colorado thereby justifying the DUI investigation. This information, coupled with the fact that the Trooper could smell marijuana emanating from inside the vehicle, justified the canine search."

¶12 Harning pleaded guilty to both counts and reserved his right to appeal to the District Court. On appeal to the District Court, the District Court found the Justice Court erred in determining Harning had not been seized within the meaning of the

---

[3] Trooper DiGiovanna neither testified that Harning's out-of-state license plates contributed to his suspicion nor relied upon the license plates to demonstrate probable cause in his search warrant application.

Fourth Amendment, but concluded the seizure was constitutionally sound. The District Court affirmed the denial of Harning's motion to suppress. Harning appeals.

## STANDARD OF REVIEW

¶13 On appeal from a district court's review of a lower court ruling, we review the lower court ruling as if appealed directly to this Court without district court review. *State v. Hoover*, 2017 MT 236, ¶ 12, 388 Mont. 533, 402 P.3d 1224. Our review of a lower court's denial of a motion to suppress is whether the lower court's findings of fact are clearly erroneous and whether it correctly applied the controlling law to those facts. *Hoover*, ¶ 12. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the trial court misapprehended the effect of the evidence, or if this Court has a firm or definite conviction that the trial court committed a mistake. *State v. Maile*, 2017 MT 154, ¶ 8, 388 Mont. 33, 396 P.3d 1270. We review the lower court's conclusions of law and application of legal standards de novo. *Hoover*, ¶ 12.

## DISCUSSION

¶14 *Whether particularized suspicion existed to support extending Harning's traffic stop into a drug investigation.*

¶15 Both the Fourth Amendment to the United States Constitution and Article II, Section 11, of the Montana Constitution protect persons from unreasonable searches and seizures, including brief investigatory stops such as traffic stops. *State v. Wilson*, 2018 MT 268, ¶ 25, 393 Mont. 238, 430 P.3d 77. The fundamental purposes of the Fourth Amendment and Article II, Section 11, are "to protect the privacy and security of individuals" from unreasonable government intrusion or interference. *Hoover*, ¶ 14 (citing

7

*State v. Clayton*, 2002 MT 67, ¶ 11, 309 Mont. 215, 45 P.3d 30). To initiate a traffic stop, a law enforcement officer must have particularized suspicion that the occupant of the vehicle is or has been engaged in unlawful behavior. Section 46-5-401(1), MCA. A traffic stop may not last longer than necessary to effectuate the purpose of the stop. Section 46-5-403, MCA. However, investigative stops may be prolonged, and the scope of the investigation enlarged, provided the scope of the investigation remains within the limits created by the facts and suspicions from which they arose. *State v. Estes*, 2017 MT 226, ¶ 15, 388 Mont. 491, 403 P.3d 1249.

¶16 Harning contends Trooper DiGiovanna lacked particularized suspicion to justify extending the traffic stop and ordering a canine sniff search. Harning does not contest the validity of the DUI investigation. The State counters that the canine sniff was lawful because Trooper DiGiovanna had specific, articulable facts supporting a particularized suspicion that Harning was engaged in drug activity. The State contends that Trooper DiGiovanna had particularized suspicion to make the initial traffic stop when he observed Harning speeding. Thereafter, the odor of marijuana and Harning's admission to using marijuana provided particularized suspicion for a DUI investigation. Finally, the State argues that, under the totality of circumstances, particularized suspicion existed to support a canine search.

¶17 A canine sniff of a vehicle constitutes a search under Article II, Sections 10 and 11, of the Montana Constitution. *State v. Tackitt*, 2003 MT 81, ¶ 22, 315 Mont. 59, 67 P.3d 295. Accordingly, law enforcement must have a particularized suspicion of wrongdoing before conducting a canine search of an individual's vehicle. *Tackitt*, ¶ 31.

8

Particularized suspicion requires objective data from which an experienced officer can make certain inferences and a resulting suspicion that the occupant of the vehicle is or has been engaged in wrongdoing. *Estes*, ¶ 17. Relevant considerations include the quantity, substance, quality, and degree of reliability of information known to the officer. *Hoover*, ¶ 17. Whether an officer possessed particularized suspicion of criminal activity is a question of fact assessed under the totality of circumstances, but the related question of whether the circumstances indicated illegal activity is a question of law. *State v. Kaufman*, 2002 MT 294, ¶ 11, 313 Mont. 1, 59 P.3d 1166.

¶18 An officer need not be certain, or even correct, that a person is engaged in criminal activity. *Wilson*, ¶ 28. However, particularized suspicion requires more than mere generalized suspicion or an undeveloped hunch of criminal activity. *Wilson*, ¶ 28. "Where the only basis for suspecting a specific person of wrongdoing is inferences that could be drawn from the conduct of virtually any law-abiding person, the resulting suspicion cannot, by definition, be particularized." *State v. Reeves*, 2019 MT 151, ¶ 13, 396 Mont. 230, 444 P.3d 394. If the officer lacks particularized suspicion, and no other exceptions to the search warrant requirement apply, the search and seizure is unconstitutional and all evidence emanating from the illegal testing must be suppressed. *State v. Zimmerman*, 2018 MT 94, ¶ 17, 391 Mont. 210, 417 P.3d 289.

¶19 We conclude the record does not support that Trooper DiGiovanna had particularized suspicion to extend Harning's traffic and DUI stop into a drug investigation of the contents of Harning's vehicle. Trooper DiGiovanna's testimony that he determined to conduct a drug investigation of Harning's vehicle after citing Harning for speeding

9

guides our analysis. Up to that point, Trooper DiGiovanna validly pulled Harning over for speeding. Aside from declining to roll his window down more than three or four inches and "hemm[ing] and haw[ing]" in response to Trooper DiGiovanna's questions, "immediately" raising the trooper's suspicions, Trooper DiGiovanna did not articulate objective data indicating Harning's vehicle likely contained drugs. Trooper DiGiovanna smelled marijuana, and Harning truthfully admitted to smoking earlier, justifying the DUI investigation. *See State v. Allen*, 1998 MT 293, ¶ 12, 292 Mont. 1, 970 P.2d 81 (concluding the smell of alcohol and admission of alcohol use was sufficient to justify the administration of field sobriety tests). However, Harning did not admit to smoking marijuana in his truck, but rather, 80 miles away in Big Timber. Harning fully cooperated with Trooper DiGiovanna, providing his license, registration, and insurance upon request. Harning also complied with all directives during the DUI investigation. Trooper DiGiovanna never testified to any facts that were specific and particularized to Harning's vehicle which would support a suspicion *the vehicle* itself contained illegal drugs. Importantly, although Harning was subjected to a traffic stop and DUI investigation, he retained a right of privacy in his vehicle which, absent particularized and articulable facts relating to his vehicle, could not be violated. "[O]fficers may rely on a distinctive odor as a physical fact indicative of a possible crime; but its presence alone does not strip [an individual] of constitutional guarantees against unreasonable search." *Taylor v. United States*, 286 U.S. 1, 6, 52 S. Ct. 466, 467 (1932) (finding the odor of whiskey during the Prohibition Era insufficient to justify a warrantless search).

10

¶20 At the moment Trooper DiGiovanna determined to initiate a drug investigation of Harning's vehicle, which we note was prior to commencing his DUI investigation, he was aware of the following facts: (1) Harning's "evasive" behavior, including his refusal to roll the window down, (2) the odor of marijuana and admission of smoking earlier in Big Timber, (3) Harning's response to Trooper DiGiovanna that he did not have marijuana on him, and (4) Harning had no prior drug charges. Trooper DiGiovanna failed to articulate, beyond a circular definition of "just subtle kind of things" about Harning's "evasive" behavior, how he came to suspect Harning had drugs in his vehicle. Trooper DiGiovanna did not specify how the "subtle kind of things" were consistent with criminal behavior, nor did his testimony that he had "pulled people over that are nervous, and they don't act like that" provide sufficient objective data that drugs would be found in Harning's vehicle. A stop may not last longer than necessary to effectuate the purpose of the stop and the scope of the investigation must remain within the limits created by the particularized suspicion. Particularized suspicion for the traffic stop was based on speeding, which developed more facts and thereby ripened into a DUI investigation based on the odor of marijuana emanating from a vehicle whose only occupant was the driver. Once any suspicion of DUI was dispelled and no facts warranted additional investigation, Harning should have been released. Here, there were no additional facts suggesting, for example, that Harning's vehicle in particular contained drugs, that Harning was using his vehicle to transport drugs, or that Harning's vehicle had been used to facilitate drug activity. Thus, there was no basis to extend the search to Harning's vehicle once Harning was determined not to be impaired.

11

¶21    The State argues, even if the facts here prove distinguishable from other cases, those distinctions are mitigated by assessing the facts under the totality of the circumstances. While facts giving rise to a particularized suspicion will, naturally, vary from case to case, the facts of *Wilson* prove analogous here.  In *Wilson*, an MHP trooper pulled a vehicle over for an expired registration.  *Wilson*, ¶ 3.  During the traffic stop, the trooper observed a lack of eye contact and nervous behavior by the vehicle's passenger, Wilson, as well as the vehicle's lived-in appearance.  *Wilson*, ¶ 4.  The trooper testified the driver's "nerves were at a different level" than a typical traffic stop and cited heavy breathing and the lack of eye contact.  *Wilson*, ¶ 32 (internal quotations removed).  The trooper learned the vehicle was borrowed and that the driver, a newlywed, was traveling home from his wedding without his wife.  *Wilson*, ¶¶ 5-6.  The trooper ordered a canine search, which resulted in a positive hit for drugs in the vehicle.  *Wilson*, ¶ 15.  On appeal, we reversed Wilson's conviction and concluded that while "a driver's post-stop behavior may, in combination with more objectively incriminating behavior, amount to particularized suspicion, [Wilson's] conduct alone did not meet the minimum threshold."  *Wilson*, ¶¶ 34, 39.  We rejected the State's argument that "[a] messy vehicle, a nervous driver with an unlit cigarette, daylight use of a Montana highway, using a borrowed vehicle, and the fact that newlyweds aren't traveling together following their wedding" amounted to a particularized suspicion and concluded, instead, the indicators revealed only a generalized hunch.  *Wilson*, ¶ 34.

¶22    While there were certain indicators present here that were not present in *Wilson*, the converse is also true.  Harning's vehicle was not messy or lived-in.  Trooper DiGiovanna did not testify that he found Harning's travel plans suspicious.  Trooper DiGiovanna

12

testified to his perception of atypical behavior during the stop. We rejected similar testimony concerning the trooper's observations in *Wilson*, and Trooper DiGiovanna provided even less information than the trooper in *Wilson* to support his observation that Harning's behavior was atypical. Moreover, unlike *Wilson*, Harning had no issue producing either his proof of insurance or his driver's license, had not borrowed the vehicle from an acquaintance, and had no prior drug charges.

¶23 Trooper DiGiovanna's relative lack of experience at the time he pulled over Harning further distinguishes the facts here. *See, e.g.*, *Wilson*, ¶ 42 (Rice, J., dissenting) (noting the trooper's training included Basic and Advanced Highway Patrol and three subsequent schools focused specifically on vehicle-related drug interdiction); *Estes*, ¶¶ 18, 27 (finding a particularized suspicion and noting the trooper's "eleven years of experience as an officer of [MHP and] over seven hundred hours of drug and K-9 handling training"); *State v. Marino*, 2016 MT 220, ¶¶ 7, 20, 384 Mont. 490, 380 P.3d 763 (finding a particularized suspicion and noting the officer's "significant prior experience with narcotics investigations"); *State v. Roy*, 2013 MT 51, ¶¶ 17-18, 369 Mont. 173, 296 P.3d 1169 (finding particularized suspicion and noting the officer's "roughly 20 years of law enforcement experience[,] training in drug interdiction and [involvement in] over 100 stops in which [the officer] investigated the presence of illegal drugs"). The record indicates Trooper DiGiovanna, with approximately 16 hours of training, had even less experience than the trooper in *Wilson*.

¶24 While the State contends Harning's hesitant answers and failure to roll his window down more than a few inches aroused Trooper DiGiovanna's suspicion, this, even

13

combined with the odor of marijuana and Harning's admission of smoking in Big Timber, does not amount to objective data that Harning's vehicle might contain drugs. Trooper DiGiovanna testified that Harning's behavior, and not the smell of marijuana, was what first raised his suspicion that Harning was hiding something. The dissent downplays the "annoying, frightening, and perhaps humiliating" experience of an investigatory stop, *see Terry v. Ohio*, 392 U.S. 1, 25, 88 S. Ct. 1868, 1882 (1968), ascribing a nefarious motive to Harning's statement that he "was not expecting this" and Harning's "hesitant" behavior. It is tempting to forgive an officer's illegal extension of a stop when the officer's conduct uncovers evidence of illegal conduct by a civilian, no matter how minimal; here, possession of a marijuana pipe. However, this belies the basic principle at the heart of search and seizure jurisprudence: Two wrongs do not make a right. *See Weeks v. United States*, 232 U.S. 383, 34 S. Ct. 341 (1914). An officer who impermissibly extends a detention just to fish for further evidence of wrongdoing breaches the protections afforded by the Fourth Amendment. Nervous behavior during a traffic stop is not uncommon and does not establish particularized suspicion to extend a traffic stop into a drug investigation of Harning's vehicle.

¶25 The dissent agrees with the Justice Court's determination that the canine search failed to "prolong the traffic stop past the stop's mission given that the Trooper's mission was to investigate" Harning for DUI and drug possession. But "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop . . . and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354, 135 S. Ct. 1609, 1614 (2015)

14

(internal citations omitted). The stop's "mission" was to address Harning's speeding, and Trooper DiGiovanna's "[o]n-scene investigation into other crimes . . . detour[ed] from that mission." *See Rodriguez*, 575 U.S. at 356, 135 S. Ct. at 1616.

¶26 Notwithstanding Trooper DiGiovanna's testimony that he determined to complete a drug investigation into the contents of Harning's vehicle at the same time he decided to pursue the DUI investigation, Harning never said he had smoked in his vehicle and admitted only to smoking marijuana in Big Timber, approximately 80 miles before he was stopped. The result of Trooper DiGiovanna's DUI investigation indicated he was not impaired. If Trooper DiGiovanna believed Harning was impaired and smoking marijuana in his vehicle, the results of the DUI investigation should have dispelled that belief.

¶27 The dissent points to *State v. Pierce*, 2005 MT 182, 328 Mont. 33, 116 P.3d 917, wherein the Court found probable cause to seize Pierce's vehicle based on the odor of marijuana and an admission that someone else smoked marijuana in the vehicle earlier that day. *Pierce*, ¶ 21. *Pierce* proves distinguishable on several fronts. First, as the dissent notes, *Pierce* involved the admission of smoking *inside the vehicle* by a third party. *Pierce*, ¶ 21. Harning admitted to smoking 80 miles away in Big Timber—not his vehicle.[4] Moreover, assuming Harning had admitted to smoking inside the vehicle, we have previously recognized "the mere odor of marijuana might linger in an automobile for more

---

[4] The dissent notes as "objective data" that Harning "did not live in Big Timber but had stopped there and smoked with a friend on his trip." Dissent, ¶ 32. Trooper DiGiovanna neither included this information in his search warrant application nor testified that it factored into his suspicion. Likewise, the Justice Court did not rely upon Harning's residence in concluding Trooper DiGiovanna had particularized suspicion.

15

than a day[,]" *see State v. Schoendaller*, 176 Mont. 376, 382, 578 P.2d 730, 734 (1978), minimizing the import the dissent and Justice Court incorrectly place on the distance between Big Timber and Harning's stop. Finally, as the Court noted in *Pierce*, "the issue here involves a seizure of a truck based upon the owner's admission that an offense had taken place inside it and not whether the required particularized suspicion existed, based on stale information, to conduct a dog sniff." *Pierce*, ¶ 20. Indeed, the *Pierce* Court "set aside the questionable K-9 search" based on the odor of marijuana and admission of smoking to address the issues before it. *Pierce*, ¶ 30. Conversely, the facts here implicate precisely the "questionable K-9 search" *Pierce* set aside.

¶28 We have long recognized that the State bears the burden of demonstrating an officer's particularized suspicion. *State v. Elison*, 2000 MT 288, ¶ 15, 302 Mont. 228, 14 P.3d 456. In meeting this burden, the "demand for specificity in the information upon which police action is predicated is the central teaching" of search and seizure jurisprudence. *Terry*, 392 U.S. at 21, n. 18, 88 S. Ct. at 1880. In other words, the State must demonstrate more than "just subtle kind of things." The State failed to do so here, and Trooper DiGiovanna unlawfully extended the traffic stop.

## CONCLUSION

¶29 The purpose of the initial stop was to warn Harning for speeding. Trooper DiGiovanna learned information permitting the extension of the stop into a DUI investigation. However, upon determining Harning was not impaired, the stop should have terminated. After conducting the DUI investigation, Trooper DiGiovanna possessed

16

only an undeveloped, generalized suspicion, based off the smell of marijuana, that Harning's vehicle may have contained drugs.

¶30 The Justice Court erred in denying Harning's motion to suppress. Harning's conviction is reversed and remanded for proceedings consistent with this Opinion.


/S/ LAURIE McKINNON

We concur:

/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR
/S/ JAMES JEREMIAH SHEA


Justice Jim Rice, dissenting.

¶31 I would affirm the Justice Court's denial of Harning's motion to suppress. In my view, Trooper DiGiovanna lawfully extended the traffic stop into both a DUI investigation and a drug investigation with a canine sniff, because the evidence supported either or both. For purposes of the issue challenged on appeal, the totality of the circumstances supported particularized suspicion that Harning possessed marijuana in his vehicle.

¶32 For a general suspicion of criminal activity to become particularized, an officer needs "additional 'specific and articulable facts' indicating that the occupants of the vehicle had committed, were committing, or were about to commit a specific criminal offense." *Hoover*, ¶ 19 (citing § 46-5-401(1), MCA) (additional citations omitted). Trooper DiGiovanna observed and testified to the following specific and articulable facts, which were included in the Justice Court's Findings of Fact (FOF) and Conclusions of Law

17

(COL). When Trooper DiGiovanna approached Harning's truck to investigate the speeding violation, Harning only rolled down his window three to four inches. The following can be heard from the audio of the dash cam:

> Trooper DiGiovanna: Does your window roll down any more?
> Harning: Uh, I don't feel comfortable [inaudible].
> TDG: Ok, do you feel uncomfortable about something?
> H: No, I just uh was not expecting this [inaudible].

Trooper DiGiovanna could immediately smell marijuana "wafting" from the window of the truck, even though rolled down only three to four inches. At the suppression hearing he described the odor as "new" and "not aired out." Harning said he did not have a medical marijuana card, and admitted to smoking marijuana in Big Timber, only 80 miles from the stop. He did not live in Big Timber but had stopped there and smoked with a friend on his trip.[1] Critically, when Trooper DiGiovanna asked Harning if he had any marijuana in the vehicle, Harning hesitated and then responded with the qualified answer that he did not have marijuana *on him*. "He evaded the question, didn't acknowledge the fact of the vehicle," Trooper DiGiovanna testified. "If someone is being honest they immediately say yes or no, as opposed to hesitating before responding."

---

[1] While the Court takes issue with my referencing the fact that Harning admitted to smoking when passing through Big Timber on his way to deliver the pottery, Opinion, ¶ 27 n.4, the Justice Court referenced this detail multiple times in its Order. The Justice Court concluded: "The Trooper then learned that the Defendant had smoked marijuana while on his route to Colorado thereby justifying the DUI investigation. This information, coupled with the fact that the Trooper could smell marijuana emanating from inside the vehicle, justified the canine search," COL, ¶ 27; and "The Trooper had distinct and articulable facts that the Defendant was engaged in drug activity based upon his behavior and the admission of smoking marijuana while on his route to Colorado." COL, ¶ 28. *See also FOF*, ¶ 4; *COL*, ¶ 30 (additional references to Harning admitting to smoking while traveling through Big Timber).

¶33   From this objective data, Trooper DiGiovanna made the inference, based on his training and experience,[2] that Harning was likely engaged in wrongdoing involving marijuana.[3] "Based on additional information developed during the initial lawful duration and scope of an initial investigative stop, an officer may develop new or broader particularized suspicion of criminal activity justifying expansion of the scope or duration of the stop beyond that justified by the officer's initial observations." *City of Missoula v. Kroschel*, 2018 MT 142, ¶ 19, 391 Mont. 457, 419 P.3d 1208 (citations omitted). Specially, "an officer may prolong a traffic stop to conduct a canine search where the officer has a particularized suspicion of narcotics activity." *Estes*, ¶ 16.

¶34   Trooper DiGiovanna's initial particularized suspicion to stop Harning for speeding grew into particularized suspicion for the offenses of Driving Under the Influence of Alcohol or Drugs, in violation of § 61-8-401, MCA (2017), Criminal Possession of Drug Paraphernalia, in violation of § 45-10-103, MCA (2017), Criminal Possession of Dangerous Drugs, in violation of § 45-9-102(2), MCA (2017), or any combination thereof. I would hold Trooper DiGiovanna had particularized suspicion to conduct both a DUI

---

[2] Harning's briefing emphasizes Trooper DiGiovanna's relative inexperience, and the Court appears to adopt this characterization. *See* Opinion, ¶ 23. But the level of experience required varies with the nature of the inferences made by the officer to reach particularized suspicion, and is rarely determinative. In this case, I would conclude that Trooper DiGiovanna's experience—two full days of drug detection training at the law enforcement academy, combined with working on approximately fifty cases involving drugs—was sufficient to accurately detect the odor of marijuana and observe evasive or abnormal responses to straightforward questions such as, "Do you have marijuana in the vehicle?"

[3] In addition, Harning's admission that he recently smoked marijuana unequivocally confirmed Trooper DiGiovanna's particularized suspicion that Harning "had committed . . . a specific criminal offense" involving marijuana prior to the stop. *Hoover*, ¶ 19; *see also* § 46-5-401, MCA.

investigation and a drug investigation with a canine sniff of Harning's truck, as the overlapping evidence supported either or both. In fact, he testified that after his initial conversation with Harning, in which he learned the aforementioned facts, he suspected there was marijuana in the truck and contemporaneously decided to conduct both investigations. This testimony is supported by the dash cam footage and noted by the Court. Opinion, ¶¶ 6, 19, 26. I agree with the Justice Court's determination that, "[t]he canine search did not prolong the traffic stop past the stop's mission given that the Trooper's mission was to investigate [Harning] for driving under the influence and investigate [him] for drug possession." Because the purpose of the stop evolved as Trooper DiGiovanna gained new information and developed particularized suspicion of drug activity, the stop did "not last longer than is necessary to effectuate the purpose of the stop." Section 46-5-403, MCA.

¶35 The Court holds that, "[a]side from declining to roll his window down more than three or four inches and 'hemm[ing] and haw[ing]' in response to Trooper DiGiovanna's questions . . . Trooper DiGiovanna did not articulate objective data indicating Harning's vehicle likely contained drugs." The Court further reasons that Trooper DiGiovanna's smelling of marijuana and Harning's admission to smoking earlier justified the DUI investigation. Opinion, ¶ 19. While these are certainly indicators supporting particularized suspicion of DUI, they are also "objective data indicating Harning's vehicle contained drugs." Trooper DiGiovanna testified that he "fully intended before [asking Harning] to get out the vehicle to perform both [the DUI and canine sniff investigations]."

20

¶36 The Court cites *Wilson* to support its conclusion that Trooper DiGiovanna lacked particularized suspicion. Opinion, ¶¶ 21-22. In *Wilson*, we reversed because the officer "failed to identify details that were objectively indicative of illegal drug activity," and instead only testified about generally suspicious behavior. *Wilson*, ¶ 35. While the Court focuses its comparison solely on Trooper DiGiovanna's observations of Harning's evasive behavior, clearly the signature odor of marijuana and admission of recently smoking are details objectively indicative of, what was at the time, illegal drug activity.[4] I believe the Court downplays the "substance, quality, and degree of reliability" of these marijuana-specific, crime-specific, indicators. *Hoover*, ¶ 17. Inferences of wrongdoing based on these facts could not be "drawn from the conduct of virtually any law-abiding person," because possession and use of marijuana without a valid medical marijuana card was illegal in Montana at the time Trooper DiGiovanna stopped Harning. *Reeves*, ¶ 13.

¶37 Further, unlike in *Wilson*, even the evasive behavior noted by Trooper DiGiovanna was specifically connected to illegal marijuana activity. It is a reasonable inference that Harning did not "feel comfortable" further rolling down his window, as he stated, because he was attempting to obscure the fact that his truck smelled of marijuana. He gave no competing justification for his discomfort other than he "was not expecting this."[5] We

---

[4] It is ultimately irrelevant if "Trooper DiGiovanna testified that Harning's behavior, and not the smell of marijuana, was what first raised his suspicion that Harning was hiding something," Opinion, ¶ 24. He immediately smelled the marijuana odor when interacting with Harning and observing his behavior and answers to questions. Particularized suspicion is based on the totality of the circumstances and, as testified to by Trooper DiGiovanna, both behavioral indicators and the smell and admission to smoking all factored into his decision to request a canine search.

[5] The Court claims that I downplay the stressful experience of an investigatory stop by "ascribing a nefarious motive" to Harning's behavior and statements. Opinion, ¶ 25. To the contrary, I simply

have held in previous cases that excessive air fresheners or deodorizers in a stopped vehicle was one indicator contributing to particularized suspicion of marijuana activity because it is a known method of masking the drug's odor. *Estes*, ¶ 18; *Roy*, ¶ 17. I would observe that Harning also displayed behavior that could reasonably be interpreted as attempting to mask the odor of marijuana in his truck. In addition, the qualified answer Harning gave to Trooper DiGiovanna was in direct response to him specifically asking Harning if he possessed marijuana *in his truck*. Harning's unusually phrased response was that he did not have any marijuana *on him*. Even a relatively inexperienced officer could recognize that answer as conspicuously not matching the question asked. This answer was highly suspicious and directly related to marijuana possession in Harning's truck. When Trooper DiGiovanna conducted the DUI investigation, he first patted down Harning, finding no drugs on his person, just as Harning had said. The results of the DUI investigation dispelled Trooper DiGiovanna's particularized suspicion that Harning was driving impaired, but it did not dispel his particularized suspicion that Harning possessed marijuana in his truck.

---

include the statements and behaviors that Trooper DiGiovanna testified were suspicious or evasive, and conclude they were appropriate indicators contributing to particularized suspicion. This is our Court's approach to particularized suspicion issues and is fully consistent with our precedent. In *Wilson*, we reviewed the officer's testimony about the defendant's behavior and held: "Although a driver's post-stop behavior may, in combination with more objectively incriminating behavior, amount to particularized suspicion, this conduct alone did not meet the minimum threshold." *Wilson*, ¶ 34. But we have also held that an officer's observations of a defendant's behavior, in combination with other indicators connected to drug trafficking, did meet the threshold to support particularized suspicion. *Estes*, ¶¶ 18, 20. Harning's situation is more analogous to *Estes* than *Wilson*. As noted, his post-stop behavior was combined with "more objectively incriminating behavior." I believe the Court is choosing to excuse Harning's unusual statements and behaviors by subjectively characterizing them as common "nervous behavior during a traffic stop," rather than fully engaging with their implications. Opinion, ¶ 25. Some of Harning's actions have never before been noted in our opinions, and must be included in the totality of circumstances.

22

*See Kroschel*, ¶ 13 ("Law enforcement officers must act with reasonable diligence to quickly confirm or dispel the predicate suspicion for the stop." (Citation omitted.)).

¶38 While Harning's evasiveness could potentially have innocent explanations, we have often cited non-illegal activities as supportive indicators of criminal behavior, such as utilizing multiple air fresheners, consuming energy drinks in a messy car, travelling to Oregon or North Dakota, *Estes*, ¶¶ 3, 18, or "'bobbing up and down' in the bushes across from a courthouse at six a.m." *State v. Stevens*, 2019 MT 36, ¶ 14, 394 Mont. 278, 434 P.3d 904. Here, all the objective indicators relied upon by Trooper DiGiovanna were specific to marijuana impairment, possession, or both, not simply a generalized suspicion of criminal activity. *See Wilson*, ¶ 34 (holding that a variety of suspicious indicators observed by the officer revealed "only a generalized hunch and not an articulation of specific facts demonstrating criminal behavior"); *Hoover*, ¶ 22 ("though [the officer] articulated circumstances *generally conducive* to the commission of a break-in or illegal drug use, [he] did not further articulate any specific conduct or circumstance which, in context of his articulated generalized suspicion, was particularly indicative of an imminent break-in or illegal drug use" (emphasis original)).

¶39 In *Pierce*, we held that the smell of burnt marijuana in the defendant's truck, in combination with his admission that someone else had smoked marijuana in the truck earlier that day, was enough for the officer to conclude that the contents of the truck "'offended the law.'" *Pierce*, ¶ 21. We found these facts sufficient for the officer to have *probable cause* to seize, impound, and deploy a canine sniff on the truck before receiving a search warrant. *Pierce*, ¶¶ 8, 22. While *Pierce* is distinguishable because there we

23

considered whether the facts met the probable cause standard rather than particularized suspicion, particularized suspicion is a less stringent standard. *State v. Brander*, 2004 MT 150, ¶ 8, 321 Mont. 484, 92 P.3d 1173. It makes sense that similar facts of a slightly lower level of certainty than in *Pierce* would be sufficient for particularized suspicion.[6] Here, Trooper DiGiovanna's particularized suspicion was similarly supported by the smell of marijuana and an admission that Harning had recently smoked, albeit not in his truck, but on a recent stop on his road trip.

¶40    Harning argues that "[j]ust because [he] uses marijuana does not mean that his vehicle will contain evidence of a drug offense," and cites *State v. Griffin*, 2004 MT 331, ¶ 6, 324 Mont. 143, 102 P.3d 1206. This is true, but based on the totality of the circumstances observed by Trooper DiGiovanna from his interaction with Harning, it is a reasonable inference from these facts, based on his experience, that Harning may have had marijuana or paraphernalia in the vehicle with him, especially given the strength and persistence of the odor. Particularized suspicion "does not require that an officer be certain, or even correct, that a person is engaged in criminal activity." *Wilson*, ¶ 28 (citing *Hoover*, ¶ 18).

---

[6] Even if we were not able to point to a case with similar facts, this Court looks at whether the "totality of the circumstances" supports particularized suspicion. *Wilson*, ¶ 28. Harning criticizes the Justice Court's reliance on our precedent finding particularized suspicion, arguing that "[t]he [J]ustice [C]ourt's reliance on *Marino*, *Roy* and *Estes* was misplaced. The facts in those cases are not present here." But I agree with the principle the State notes in its briefing: "The totality of the circumstances analysis is not a checklist that can be mechanically applied to each case." The Court also acknowledges that, "facts giving rise to particularized suspicion will, naturally, vary from case to case." Opinion, ¶ 21.

24

¶41 The Court has debated detailed issues of facts and law herein, but in the final analysis, this case should be determined by the requisite focus upon the record as established by the fact finder: Trooper DiGiovanna 1) stopped a vehicle for speeding; 2) immediately smelled the "new" smell of marijuana "wafting" from the driver's slightly opened window; 3) encountered the driver's unusual behavior of not rolling his window down further to talk to the officer, even upon the officer's request and a discussion about it; 4) learned that the driver had used marijuana recently on his road trip; and 5) received answers from the driver that clearly inferred marijuana was presently in the vehicle. Under any view of our precedent, these facts clearly supported a particularized suspicion of marijuana possession and justified a canine sniff.

¶42 I would affirm.


/S/ JIM RICE


Chief Justice Mike McGrath and Justice Beth Baker join in the dissenting Opinion of Justice Rice.


/S/ MIKE McGRATH
/S/ BETH BAKER