FILED

07/16/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0026

DA 23-0026

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 146

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

THOMAS WOJTOWICZ,

      Defendant and Appellant.

APPEAL FROM:   District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DC-21-201C
Honorable John C. Brown, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Jami L. Rebsom, Jami Rebsom Law Firm PLLC, Livingston, Montana

      For Appellee:

      Austin Knudsen, Montana Attorney General, Brad Fjeldheim, Assistant
Attorney General, Helena, Montana

      Audrey Cromwell, Gallatin County Attorney, Eric N. Kitzmiller, Deputy
County Attorney, Bozeman, Montana

Submitted on Briefs:   May 29, 2024

Decided:   July 16, 2024

Filed:

_____
Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 Appellant, Thomas Wojtowicz (Thomas), appeals from the August 1, 2022 Findings of Fact, Conclusions of Law, and Order Regarding Defendant's Motions issued by the Eighteenth Judicial District Court, Gallatin County and the subsequent jury verdict finding him guilty of driving under the influence of alcohol (DUI).

¶2 We restate the issues on appeal as follows:

1. *Whether the District Court erred in admitting the blood toxicology evidence?*

2. *Whether the District Court erred in denying Defendant's motion to suppress?*

3. *Whether there was sufficient evidence to prove Defendant was in actual physical control of his vehicle?*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3 On May 7, 2021, citizen John Barrick called police to report a man he had seen in a bar earlier walked out of a business complex, stepped off the curb, fell on the asphalt, and then crawled across the parking lot to his vehicle and got into the driver's seat. Barrick was concerned the man was impaired and might drive and hurt himself or someone else. Barrick provided a description of the vehicle—a green Ford Escape— and the license plate number. Officer Haydon responded to the call, made contact with the man in the driver's seat—later identified as Thomas—advising him someone had called in with concerns. Officer Haydon asked Thomas where his keys were and Thomas picked up the keys from the center console and showed them to the officer. Officer Haydon could smell the odor of alcohol coming from Thomas and noted his speech was slurred. Officer Haydon inquired as to how much Thomas had to drink that day to which Thomas responded he had

consumed a couple of shots and a glass of wine. Officer Haydon explained to Thomas that the circumstances—Thomas's difficulty in maneuvering to his vehicle, unlocking it, sitting in the driver's seat with the key in reach—indicated he was intoxicated and in actual physical control of his vehicle. Thomas does not contest that he was intoxicated but contests that he was going to drive his vehicle. He advised officer Haydon he was going to wait for his girlfriend, Connie, to come pick him up when she got off work. Officer Haydon attempted to contact Connie to confirm the information Thomas provided but she did not answer his calls.

¶4 Officer Haydon determined it appropriate to administer field sobriety tests (FSTs). As Thomas had an injured leg, he did not administer the walk-and-turn or one-legged stand. He did perform non-standardized FSTs which Officer Haydon interpreted to show difficulty performing divided attention tasks. Officer Haydon requested Thomas provide a preliminary breath test. Thomas refused. Officer Haydon then arrested Thomas for DUI. When discussing with Thomas what to do with the dog that was in his vehicle, Thomas provided Officer Haydon the telephone number to Connie's work. Officer Haydon called that number and Connie answered. Officer Haydon arranged with Connie to have someone pick up the dog. He also asked her if she had talked with Thomas about picking him up after work. Reportedly, she advised Officer Haydon she could not leave work, had not talked to Thomas about picking him up, but had planned to see him after work.

¶5 While waiting for someone to pick up the dog, Officer Haydon read Thomas the implied consent advisory form and requested Thomas provide a breathalyzer for the Intoxilyzer 8000. Thomas refused to provide a breath sample. Officer Haydon rolled up

3

the windows of Thomas's vehicle, locked it, and retrieved Thomas's cell phone and keys. As Thomas refused the breathalyzer, Officer Haydon then sought and received a warrant for a blood draw.

¶6      Thomas was charged with felony DUI based on actual physical control of his vehicle. Thomas filed a motion to suppress which the District Court denied. Thomas proceeded to trial. At trial, Thomas objected to admission of the toxicology evidence of the Montana Crime Lab who tested Thomas's blood samples for alcohol concentration— showing a blood alcohol content of "0.274, plus or minus 0.020 grams of ethanol per 100 milliliters of whole blood"—on the basis of insufficient foundation. The District Court admitted the toxicology evidence over objection. At the conclusion of the State's case, Thomas brought a motion to dismiss asserting the State failed to present sufficient evidence to prove Thomas was in actual physical control of the vehicle. The District Court denied the motion. The jury returned a guilty verdict. Thomas appeals. Additional facts will be discussed as necessary to address the issues presented below.

## STANDARD OF REVIEW

¶7      The parties agree as to the standards of review applicable to this case. We review a district court's evidentiary ruling, including whether an adequate foundation for admission has been presented, for an abuse of discretion. *State v. Weber*, 2016 MT 138, ¶ 11, 383 Mont. 506, 373 P.3d 26; *Seltzer v. Morton*, 2007 MT 62, ¶ 65, 336 Mont. 225, 154 P.3d 561; *State v. Delaney*, 1999 MT 317, ¶ 14, 297 Mont. 263, 991 P.2d 461. We review a district court's interpretation of an evidentiary rule or statute de novo. *State v. Nichols*, 2014 MT 343, ¶ 8, 377 Mont. 384, 339 P.3d 1274. We review a district court's denial of

4

a motion to suppress to determine whether the court's findings of fact are clearly erroneous or its interpretation and application of law are correct. *State v. Questo*, 2019 MT 112, ¶ 9, 395 Mont. 446, 443 P.3d 401; *State v. Copelton*, 2006 MT 182, ¶ 8, 333 Mont. 91, 140 P.3d 1074. Finally, we review a district court's denial of a motion to dismiss based on insufficiency of the evidence in a criminal case by determining, when viewed in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *State v. Hamilton*, 2002 MT 263, ¶ 10, 312 Mont. 249, 59 P.3d 387; *State v. Ford*, 278 Mont. 353, 926 P.2d 245 (1996).

## DISCUSSION

¶8    *1. Whether the District Court erred in admitting the blood toxicology evidence?*

¶9    Thomas asserts the District Court unlawfully admitted the blood toxicology results from his court-ordered blood draw without foundation—specifically, the collection tubes were improper as Officer Haydon failed to log any lot numbers or expiration dates for the collection tubes contrary to the requirements of Admin. R. M. 23.4.220(5) and (6). Admin. R. M. 23.4.220(5) and (6) provide:

> (5) The division will provide collection kits consisting of approved collection tubes and the appropriate request forms for collection of blood samples. The division reserves the right to accept or reject any blood sample submitted in a commercially available collection kit.

> (6) The approved collection tube will be one that contains a preservative, sodium fluoride or its equivalent, and an anticoagulant, potassium oxalate or its equivalent. The use of other types of collection tubes will be at the discretion of the division.

Thomas asserts these provisions "require the blood request form to be properly complied with in order to lay the proper foundation for the blood draw." Thomas further asserts the

5

Blood Test Request Form specifically requires identification of the lot number for the collection vials and identification of the expiration date of each collection vial, neither of which were provided in relation to Thomas's collection vials.

¶10     The State asserts evidence of a person's blood alcohol content is admissible in a criminal trial pursuant to §§ 61-8-404(1)(a), -404(1)(b)(ii), -405(1), MCA;[1] Admin R. M. 23.4.220; and *State ex rel. McGrath v. Twenty-First Judicial Dist.*, 2001 MT 305, ¶ 17, 307 Mont. 491, 38 P.3d 820 (A DUI defendant "is entitled to the procedural safeguards contained in the Administrative Rules of Montana.").  The State asserts the procedural safeguards provided therein were met.  Thomas's only objection with regard to admission of his blood toxicology results was based on the unknown expiration date of the vacuum seals on the vials used to collect his blood.  He does not identify how this failed to comply with the statutory provisions of §§ 61-8-404(1)(a), -404(1)(b)(ii), -405(1), MCA, or Admin R. M. 23.4.220 as there was no evidence the vacuum seals were defective.  We agree with the State.

¶11     At trial, the State presented three witnesses who testified regarding the blood collection and testing at issue here—Officer Haydon, David Singh, the clinical lab scientist at the Big Sky Medical Center who drew Thomas's blood samples, and April Mitchell, the forensic toxicologist at the Montana State Crime Lab (Crime Lab) who tested the blood samples.  Officer Haydon testified the Crime Lab provided his office with sealed kits

---

[1] Unless otherwise noted, we cite the 2019 version of the Mont. Code Ann. which was in effect at the time of the offense herein.

containing the necessary items to obtain a blood sample. Officer Haydon provided Mr. Singh with the sealed collection kit provided by the Crime Lab and remained with Thomas and Mr. Singh during the blood draw. Mr. Singh testified he received the test kit from Officer Haydon, examined the collection vials and noted them to be in good condition, used the equipment and the non-alcoholic cleansing supplies that came in the kit, drew two vials of blood from Thomas, packaged the vials in bubble wrap, and sealed it with tamperproof evidence tape. Mr. Singh then signed and initialed the Blood Test Request Form provided by Officer Haydon certifying, "I have looked at the tube, I have looked at the container of the tube, that everything was okay." Mr. Singh attested the procedure used for the tubes was a Vacutainer so the tubes were never opened—the needle is inserted through the stopper and the vacuum in the tube sucks the blood. As the form did not contain a place to indicate the time the sample was drawn, it was included on the labels attached to the blood vials. Mr. Singh also attested the vials contained crystals or powders to maintain the integrity of the sample and during the blood draw nothing occurred that could have contaminated the samples or affected the reliability of testing on the samples. Officer Haydon and Singh then placed the sealed package in a box and sealed the box with evidence tape to ready it for mailing to the Crime Lab. It was mailed to the Crime Lab and Officer Haydon requested the blood samples be tested for alcohol concentration.

¶12 Without objection, Ms. Mitchell testified to her training, credentials, experience, and the procedure used for testing blood samples for alcohol. She testified she tests blood samples for alcohol about 40 times per week. With regard to Thomas's samples,

7

Ms. Mitchell testified they were received uneventfully, undamaged, with sufficient sample to test. She related she does not typically get the blood test request form containing information as to lot number or expiration date. Of import with regard to the expiration date of tubes Ms. Mitchell testified in response to defense counsel:

Q. If a tube is expired, that blood sample isn't valid, is it? Because those tubes are no good and they should be thrown out?

A. So there's a scientific paper that looked at those expiration dates. It actually refers to the vacuum of the tubes. So it's the tube's ability to pull in the blood, and so if that's expired, then that paper states that the blood may not fill the tube as it would if it were unexpired. Typically, we don't suggest that people use expired tubes, but that's what that means.

Q. Okay. So expired tubes need to be discarded; is that correct?

A. Yes.

Following this exchange, defense counsel renewed her objection to admission of testing results based on lack of foundation. The State then asked some follow-up questions:

Q. Ms. Mitchell, the testimony that you just gave with regards to the expiration date on the tubes pertains to concerns about wether [sic] or not the tube could actually suck or pull the blood sample into the vial, correct?

A. Yes.

Q. Okay. It has nothing to do with the contents of the vial?

A. Correct.

Q. In this case, there was an adequate sample of blood contained in both of the vials, correct?

A. Yes.

Q. Okay. So there was no question that the sample quantity was adequate for doing blood testing in this case?

8

A. That's correct. If I get a sample that doesn't have enough, that would be documented on the report.

Q. And that could be as a result of a poor vacuum seal on the tubes from the crime lab?

A. It's possible, yes.

Q. Okay. But that didn't happen in this case, correct?

A. Not to my knowledge. I wasn't there for the blood draw, but there was sufficient sample for my testing.

Q. And the vials otherwise were sealed properly and shipped there properly to the crime lab?

A. Yes.

Q. And you didn't notice anything about the samples themselves or the results that suggested to you that the test results were unreliable?

A. No, I did not.

The District Court ultimately overruled the renewed objection, concluding the objection went to the weight to be given to Ms. Mitchell's testimony, which was for the jury to consider. Ms. Mitchell testified the blood alcohol concentration of Thomas's blood sample was "0.274, plus or minus 0.020 grams of ethanol per 100 milliliters of whole blood."

¶13 Pursuant to § 61-8-404(1)(b)(ii), MCA, a report of a test of a person's blood is admissible if "a blood sample was analyzed in a laboratory operated or certified by the department . . . and the blood was withdrawn from the person by a person competent to do so under 61-8-405(1)." Here, the blood sample was analyzed in a laboratory operated by the department and Thomas has made no claim the person who drew his blood was not competent to do so. Further, there is nothing in Admin R. M. 23.4.220 specifically

9

requiring identification of vial expiration dates. While the Blood Test Request Form provided for identification of the lot number for the collection vials and identification of the expiration date of each collection vial, the crime lab did not reject the blood sample submitted as it had the discretion to do under Admin. R. M. 23.4.220(5) had it identified a defect in the collected sample. Further, there is no evidence in the record the blood samples were tainted in any manner or that there was any leakage or dissipation of the blood sample such that the samples were of insufficient quantity to test for alcohol. We agree with the District Court that under the circumstances present here, the failure of the Blood Test Request Form to identify the lot and expiration dates of the test kit vials went not to the authenticity of whether the samples came from Thomas but to the weight and credibility to be given to the witnesses and testing evidence presented which is within the province of the jury to determine. Thus, we find no error in the District Court's admission for consideration by the jury of the toxicology testing results.

¶14   Next, Thomas asserts the District Court erred in failing to provide a cautionary jury instruction as to what weight of the evidence may mean or a limiting instruction for the blood result. The State counters that Thomas did not request or offer any type of cautionary or limiting jury instruction explaining the court's ruling and on appeal has not specified what the instruction would have entailed or why it was legally necessary. It is well-established that to properly preserve an issue for appeal, a party must raise it in the district court as it is fundamentally unfair to fault the district court for failing to make a correct ruling on an issue it was not given the opportunity to consider. *State v. Larson*, 2022 MT 223, ¶ 24, 410 Mont. 424, 519 P.3d 1243. As such, we decline to consider

10

Thomas's assertion the District Court failed to properly instruct the jury as to the meaning of its ruling with regard to the blood test results.

¶15     *2. Whether the District Court erred in denying Defendant's motion to suppress?*

¶16     Thomas asserts Officer Haydon violated his right against unlawful search and seizure by searching Thomas's vehicle—demanding he give over the key location— and by obtaining a receipt from a bar[2] without a warrant or an exception to the requirement for a warrant. The State asserts Thomas provides no authority to support his assertion of an unlawful search. After receiving the citizen report that Thomas had been in a bar and then stumbled and crawled across the parking lot to his vehicle and was potentially going to drive at risk to himself and others, Officer Haydon was dispatched to investigate. He encountered Thomas sitting in the driver's seat of his car. He could smell alcohol on his breath and upon initiating contact with Thomas noted his speech to be slurred. Officer Haydon indicated to Thomas why he had been dispatched and the concern reported by Barrick. Thomas related he was not driving. Within two minutes of encountering Thomas sitting in the driver's seat, Officer Haydon stated, "I mean, you're sitting in the driver's seat, where are your keys?" Thomas then picked his keys up from the center console and showed them to Haydon. There is no evidence Officer Haydon searched the vehicle

---

[2] After Thomas's arrest, the State obtained a receipt from The Rocks Tasting Room, the bar Thomas was reportedly in prior to Officer Haydon locating him in his vehicle. The receipt indicated Thomas had purchased three shots and one glass of wine consistent with his prior admission of such to Officer Haydon when he first encountered Thomas. Officer Haydon testified about the receipt and the purchases made by Thomas and the receipt was entered into evidence without objection.

looking for keys or anything else prior to arresting Thomas for DUI. Upon arrest, Officer Hayden removed the keys from the console when he locked and secured the vehicle after someone retrieved Thomas's dog.

¶17 The Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution both give people the right to be free from unreasonable searches and seizures of their "persons, houses, papers, and effects." U.S. Const. amend. IV; Mont. Const. art. II, § 11. To protect against unreasonable searches and seizures, police must obtain a warrant for the search of a person's home, body, or other place or thing, or for seizure of any person or thing. *State v. Peoples*, 2022 MT 4, ¶ 15, 407 Mont. 84, 502 P.3d 129. A temporary investigative stop, or *Terry* stop, is an exception to the warrant and probable cause requirements of the Fourth Amendment and Article II, Section 11. *State v. Noli*, 2023 MT 84, ¶ 30, 412 Mont. 170, 529 P.3d 813; *State v. Gopher*, 193 Mont. 189, 192-94, 631 P.2d 293, 295-96 (1981).

¶18 Here, based on citizen Barrick's report to law enforcement, Officer Haydon made initial contact with Thomas. Upon his initial contact, he observed Thomas in the driver's seat of a vehicle, smelled the odor of alcohol coming from Thomas, and noted his speech to be slurred. Officer Haydon inquired as to how much Thomas had to drink that day to which Thomas responded he had consumed a couple of shots and a glass of wine. Officer Haydon's observations of Thomas were consistent with the concerns reported by Barrick and were sufficient to provide particularized suspicion to begin a DUI investigation.

¶19 Particularized suspicion "requires objective data from which an experienced officer can make certain inferences and a resulting suspicion that the occupant of the vehicle is or

12

has been engaged in wrongdoing." *State v. Harning*, 2022 MT 61, ¶ 17, 408 Mont. 140, 507 P.3d 145. Consideration of the quantity, substance, and reliability of the information known to the officer is relevant to determine whether there was particularized suspicion. *Harning*, ¶ 17. Whether the officer had particularized suspicion is a question of fact reviewed under the totality of the circumstances. *Harning*, ¶ 17. An officer does not need to be certain or correct that a person is engaged in unlawful behavior, but "particularized suspicion requires more than mere generalized suspicion or an undeveloped hunch of criminal activity." *Harning*, ¶ 18. An officer's particularized suspicion may also be based on a citizen informant's report if such contains "sufficient indicia of reliability." *State v. Nelson*, 2017 MT 237, ¶¶ 11, 21, 389 Mont. 1, 402 P.3d 1239.

¶20 A citizen informant's report is generally considered reliable if: 1) the informant identified himself to law enforcement, 2) the report is based on the informant's personal observations; and 3) the officer's own observations corroborate the informant's report. *Nelson*, ¶ 11. All three of these criteria were present—Barrick identified himself to law enforcement, made a report based on his personal observations, and Officer Haydon's observations corroborated Barrick's information. An officer who initiates an investigative stop may only detain an individual for as long as necessary to effectuate the purpose of the stop. *State v. Wilson*, 2018 MT 268, ¶ 25, 393 Mont. 238, 430 P.3d 77. A stop may be prolonged and the scope of the investigation broadened so long as it remains within the limits created by the facts and the suspicions from which they arose. *Wilson*, ¶ 25. After developing particularized suspicion to conduct a DUI investigation, Officer Haydon asked Thomas where his keys were and Thomas showed Officer Haydon that his keys were in

13

the console of the vehicle. There is no evidence or even claim that Officer Haydon inappropriately prolonged or expanded his DUI investigation. Prior to arresting Thomas for DUI, Officer Haydon did not search the vehicle or take control of Thomas's keys. As such, there was no search of or evidence gained from a search of the vehicle to be suppressed.

¶21 With regard to the bar receipt, Thomas has provided no analysis as to how his constitutional rights were violated by the State's subsequent further investigation and obtainment of his bar receipt. "It is not the job of this Court to conduct legal research on a party's behalf, to guess at his precise position, or to develop legal analysis that may lend support to that position." *Whitefish Credit Union v. Sherman*, 2012 MT 267, ¶ 16, 367 Mont. 103, 289 P.3d 174.

¶22 *3. Whether there was sufficient evidence to prove Defendant was in actual physical control of his vehicle?*

¶23 Lastly, Thomas asserts the State's evidence was insufficient to prove the "actual physical control" element of the DUI offense. As charged, to convict Thomas of DUI, the State had to prove Thomas was 1) under the influence of alcohol, 2) in actual physical control of a vehicle, which was 3) upon the ways of the state open to the public. Section 61-8-401(a), MCA. Thomas does not contest he was under the influence of alcohol nor that his vehicle was on the ways of the state open to the public. He contests that he was in actual physical control of his vehicle. A person is in "actual physical control" of a vehicle when he is not a passenger and is "in a position to cause the vehicle to move, or control the vehicle's movement in some manner or direction." *State v. Wells*, 2021 MT 103, ¶ 18, 404

Mont. 105, 485 P.3d 1220.  It includes, but is not limited to driving, pushing, coasting, or parking a vehicle.  *Wells*, ¶ 18.  Instructions 11 and 12, to which Thomas makes no challenge on appeal, instructed the jury as to the "actual physical control" element:

INSTRUCTION NO. 11

A person is in "actual physical control" of a vehicle, within meaning of the driving under the influence statute, when an individual is not a passenger and is able to cause the vehicle to move or control the vehicle's movement in some manner or direction.

Actual physical control of a vehicle includes, but is not limited to, driving, pushing, coasting, or parking a vehicle. An individual need not be conscious to be in actual physical control. Nor does an individual relinquish control over a vehicle simply because it is incapable of starting or moving.

INSTRUCTION NO. 12

Among the factors appropriate for the jury to consider in determining whether a person had actual physical control of a vehicle are:

(1) where in the vehicle the defendant was located;
(2) whether the ignition key was in the vehicle, and where the key was located;
(3) whether the engine was running;
(4) where the vehicle was parked and how it got there;
(5) whether the vehicle was disabled (broken down, mechanically inoperable, stuck, or otherwise immovable); and
(6) how easily the defendant could have cured the vehicle's disability.

This list is not all-inclusive. The jury may consider other relevant factors not listed.

No single factor, however, will necessarily determine whether a person is in actual physical control of a vehicle. It is up to the jury to decide what weight to give to each factor.

¶24 Thomas argues the vehicle was not running, the key was not in the ignition and not within his reach, and he had waited 19 minutes for a ride before Officer Haydon arrived. He argues these facts support the State did not prove beyond a reasonable doubt that he

15

was in actual physical control of the vehicle. Contrarily the State asserts the facts presented to the jury when viewed in the light most favorable to the State support the jury's conclusion Thomas was in actual physical control of his vehicle. We agree with the State. Thomas was located by law enforcement sitting in the driver's seat, not the passenger seat, of his vehicle. No other person was with him. The whereabouts of the keys to the vehicle were known to him and readily available to him in the center console. He had driven the vehicle to its location earlier in the day. A reasonable juror could conclude from this evidence beyond a reasonable doubt that Thomas was, at the time of investigation and arrest, in a position to cause the vehicle to move or control the vehicle's movement in some manner or direction. Further, the jury was in a position to weigh the competing evidence presented by Thomas—that he recognized he should not drive, did not intend to drive while intoxicated, did not have the keys in the ignition, etc.—and determine what they believed to be more credible and worthy of belief.

## CONCLUSION

¶25 The District Court did not err in admitting the blood toxicology results or in denying Thomas's motion to suppress. Further, when viewed in the light most favorable to the state, the evidence was sufficient to prove beyond a reasonable doubt that Thomas was in actual physical control of his vehicle. Affirmed.

/S/ INGRID GUSTAFSON

We concur:

/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE

16